John William **ELLIOTT**, with alias', Appellant,

v.

**The STATE of Texas, Appellee.**

**No. 69760.**

Court of Criminal Appeals of Texas, En Banc.

April 14, 1993.

Rehearing Denied June 16, 1993.

Walter C. Prentice, Austin (court-appointed on appeal only), for appellant.

Ronald Earle, Dist. Atty., and Philip A. Nelson, Jr., Asst. Dist. Atty., Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MEYERS, Judge.

Appellant was indicted for the offense of murder committed in the course of kidnapping and aggravated sexual assault.

Tex.Penal Code Ann. § 19.03(a)(2). The trial court authorized the jury to convict appellant under either theory, and submitted alternative verdict forms. On January 13, 1987, the jury found appellant guilty of murder in the course of aggravated sexual assault. At the punishment phase of trial the jury gave affirmative answers to special issues enumerated in Tex.Code Crim. Proc.Ann. art. 37.071 § (b), and appellant's punishment was assessed accordingly at death. *Id.,* § (e). Appeal is automatic to this Court. *Id.,* § (h).

## I

In his first point of error appellant contends the evidence is insufficient to establish the State's theory of lack of consent to the sexual intercourse between appellant and the victim, Joyce Munguia. The State proceeded upon a theory of lack of consent, and the trial court defined the issue in the jury charge, exclusively in terms found in the sexual assault statute, Tex.Penal Code Ann. § 22.011(b)(3): "[a] sexual assault is without consent of the other person if the other person has not consented and the actor knows the other person is physically unable to resist."[1] Appellant alleges the evidence failed to show Munguia was "physically unable to resist" at the time of the purported sexual assault.

The record shows that in the early evening of Friday, June 13, 1986, at about 6:30 p.m., Munguia was on her way to a bus stop when she was beckoned over to join a group of young men gathered around the tailgate of a pickup truck parked in the driveway of the Elizondo residence, at 2808 Gonzales, in Austin. Among those in the group were Ricky Elizondo, Pete Ramirez, Danny Hanson and appellant. Over the course of the next three hours Munguia drank anywhere from three to six beers, took "a big drink" of Everclear from a shared bottle, and ingested an undisclosed quantity of cocaine.

Both Hanson and Elizondo testified for the State. Their accounts are somewhat different, and we will summarize them separately. According to Hanson, Munguia was upset because, as she reported, her boyfriend was seeing his ex-wife again behind her back. Hanson consoled her in the backyard. Elizondo came back and asked Munguia if she would like to wash her face inside, and they went in the house. A short time later, appellant and Ramirez followed them inside, with Hanson close behind. There they found the bathroom door locked. Back outside, appellant and Hanson could see through the bathroom window that Elizondo "was kissing" Munguia. Elizondo's brother got a coat hanger, and appellant opened the door to the bathroom. Hanson related that "when we opened the door, [Munguia] was on her knees in front of [Elizondo] and [Elizondo] was zipping his pants up." Hanson thought that Elizondo and Munguia had been engaging in "probably oral sex[,]" but speculated that "maybe [Elizondo] tried to get her to do something but she—maybe she didn't want to."

---

1. Tex.Penal Code Ann. § 19.03(a)(2) makes it a capital offense to commit murder in the course of aggravated sexual assault under Tex.Penal Code Ann. § 22.021, rather than simple sexual assault under § 22.011. At the time of the offense, § 22.021 defined the offense of aggravated sexual assault without any reference whatsoever to § 22.011. Accordingly, it is thus debatable whether, in the instant cause, the meaning of "without consent" contained in the aggravated sexual assault statute was, at the time of appellant's trial, necessarily limited to the "exclusive" definitions contained in subsection (b) of the simple sexual assault statute. See Committee Comment following § 21.03 (now § 22.-011) of the Texas Penal Code, A Proposed Revision, State Bar Committee on Revision of the Penal Code, (Final Draft 1970), from which the definition that was submitted to the jury in this cause was taken. However, effective September, 1, 1987 § 22.021 was amended to add subsection (c), which provides:

> An aggravated sexual assault under this section is without the consent of the other person if the aggravated sexual assault occurs under the same circumstances listed in Section 22.-011(b) of this code.

Presumably, at the time of trial, the State could have obtained a conviction upon the broader definition of "without consent" that can be derived from Tex.Penal Code Ann. § 1.07(a)(9): without "assent in fact, whether express or apparent." Nevertheless, because the State failed to object to the court's charge, we are constrained to measure sufficiency of the evidence according to the only definition that was submitted. *Boozer v. State,* 717 S.W.2d 608 (Tex.Crim.App.1984).

All the men then went back outside, followed shortly by Munguia, who asked Hanson to walk her home. Hanson could tell Munguia was drunk "[b]ecause she was crying and her words were slurred, couldn't understand her that good, and she was kind of walking like she couldn't walk too good." Hanson testified:

A ... we started walking on Gonzales, headed east.

Q Okay, and were you by yourself, just the two of you?

A Yes.

Q Did she have trouble walking at that time?

A Yes.

Q So where were—what did ya'll do?

A We were walking, and then she—she told me that [Elizondo] wouldn't leave her alone when they were in the house, and then we were walking along on the street and she was crying.

And then [appellant] caught up to us and told me he was going to help me walk her home, and I told him just to go back, that I could do it, and then he told me that I just wanted her all for myself, and I told him, no, that I was just going to walk her home because she was drunk.

Q And then what happened?

A And then she almost passed out. It seemed like she was going to fall down and [appellant] picked her up, and I kept telling him to put her down, to let me walk her home, and he took her under the bridge.

Q Now, you say that she almost passed out. How could you tell?

A Because she—it was like she was going to fall down and [appellant] caught her.

Q And how did he pick her up?

A He put his legs under her—I mean his arms under her legs and picked her up.

Q Did you help him do this?

A No.

Q Now, where were you on Gonzales Street?

A We were about three or four houses down from the Elizondo's house.

Q And where did you go? Or where did he take her?

A Under the bridge, into some wooded area.

Q Was it dark under there?

A Yes.

Appellant stood Munguia up and began to remove her shorts and panties. Hanson asked appellant to "let her go, to let me take her home, and that's when he said that he was going to kick my ass or he was going to hit me or something." At about this moment Elizondo and Ramirez arrived. Munguia was "crying, she was asking me to help her, to take her home." Appellant laid her down on her back in the grass and began to have sex with her. Munguia "was telling him to stop, to leave her alone. She was—she kept yelling my name to help her, to get her out of there." Hanson watched as, after appellant, first Ramirez and then Elizondo had sex with Munguia, and all the while "she kept on calling me to help her[.]"

Q And then what happened?

A And then she yelled out that she was going to go straight to the police when they were done.

Q And what—as best you can remember what was it that she said?

A She said—she said, I'm going to go straight to the police when ya'll get through.

Q And what condition was she in at that time?

A She was still a little drunk. When they were raping her, she couldn't fight them off. It was like she couldn't even move.

Q Was she still crying?

A Yes.

Q Did she ever stop crying?

A No.

Q Did she ever stop calling you, your name, and asking you for help?

A No.

Q So what happened then after she said she was going to call the police?

A Then I noticed [appellant] and [Elizondo] were—stood on one side, and I

remember hearing [appellant] say, We're going to have to get rid of her.

Q And then what happened?

A And then [Ramirez] ran off to his truck and [appellant] ran off to [Elizondo's] house.

Still on the ground, Munguia asked Hanson to help her find her clothes. Hanson picked them up and began to hand them to her, but Elizondo "grabbed them out of my hand and threw them away." He then looked at Hanson and told him, "You too, Danny." At this, Hanson fled to call the police.

On cross-examination, defense counsel questioned Hanson about the moment at which appellant had lifted Munguia and carried her under the bridge, and the following exchange occurred:

Q It's not like she was passing out at the time. You might say she would be unstable on her feet, but she was able to stand there.

A Well, she was saying—she was telling me to take her home.

Q Okay.

A And if she really wanted to go, it looks like she would have got away from him, and I think if he would have let her go, she would have fell.

Q The fact of the matter is that she didn't try to pull away or really offer any resistance at all; is that true?

A Right. She couldn't. I think she was too drunk to.

Q Okay, we'll talk about that in a minute. I want to get this straight, that she never, I don't know, fought back or anything like that.

She pretty much just allowed [appellant] to do what he wanted and what you're saying is it's because she was too drunk to do anything else. Is that what you're saying?

A Right, but she kept saying for him to stop.

\* \* \* \* \* \*

Q And likewise, when he got on top of her, she didn't offer any resistance to him like that or to [Elizondo] or to [Ramirez] either.

You felt she was too intoxicated to, I understand, but the fact is that she didn't offer any kind of resistance at all; is that true.

A Right.

Shortly thereafter, the following colloquy took place:

Q Now, you're saying the reason that [Munguia] couldn't put up any resistance at all was because she was intoxicated. Is that what it was?

A Yes.

Q Now, honestly, if she had wanted to fight some, it's not like she was passing out the entire time or something like that. If she had wanted to struggle or wanted to resist some, she could have struggled; isn't that true?

A I guess so.

Q Okay. I mean, everybody knows—I guess what you're saying is—what you're saying is that she was so drunk that it would have been easy to overcome her resistance.

Is that what you're saying—

A Yes.

Q —is that she was so drunk—she could have struggled some if she would have wanted to, but because she was so drunk, anyone could have managed to overcome that resistance. Is that what you're really saying?

A Yes.

Q Okay, so it's not that she wasn't capable—not like it was physically impossible to resist, it's just that she was real drunk and she didn't resist; is that true?

A Yes.

\* \* \* \* \* \*

Q ... It's just that under all the circumstances, she didn't resist at all, even though she may have been able to; is that true?

A Right.

\* \* \* \* \* \*

Q ... [W]as she still on the ground when you left then?

A Yes.

Q Okay, so you don't know if she was able to stand back up at that point or not?

A No, I don't.

Q Okay. Is there any reason why you would think that she was too drunk to stand back up?

A No.

Elizondo's testimony coincided with Hanson's in general outline, with differences in detail. He testified Munguia was "kind of drunk" when he escorted her to the bathroom, and that after she used the bathroom she "just laid down" on the floor and they had consensual sex. When he heard someone at the door, Elizondo "just picked up my pants" and "opened the door." He could not remember "if [Munguia] picked up her pants or not or if they helped her." Everyone went outside, and Hanson and Ramirez told Elizondo that they were going to walk Munguia home. Munguia was "staggering" and "[t]hey were holding her up." After Elizondo told appellant he had had sex with Munguia, appellant began to follow Hanson and Ramirez, who were leading Munguia under the bridge. Elizondo eventually followed too.

When Elizondo arrived, Ramirez was having sex with Munguia. Appellant then had sex with her, followed by Elizondo.

Q What condition was she in at this time?

A She wasn't saying nothing.

Q What did she look like?

A She was awake. She wasn't fighting or nothing.

Q Was she drunk?

A Yes, ma'am.

On cross-examination Elizondo testified:

Q Did you think that she was so drunk that if she had wanted to, that she wouldn't have been able to have—for instance, to have hit [appellant] or [Ramirez]? Would she have been able to swing her arm and hit him if she would have wanted to?

A Yeah.

Q She would have been able to have scratched him if she would have wanted to?

A Yes.

Q She could have put her legs together and tried to hold them together if she'd wanted to?

A Yes.

Q She could have tried to roll over, or something, to try to squirm away if she'd wanted to?

A Yes.

Q So she wasn't so drunk that she couldn't do any of those things. It's just that she didn't; is that true?

A Yes, sir.

Elizondo then testified that Munguia began to ask for her clothes, and Elizondo desisted. When Munguia threatened to tell the police, appellant told Elizondo he was going to have to kill both her and Hanson. He instructed Elizondo to detain them while he left to find a gun. Appellant returned shortly with a belt made out of a motorcycle chain. By this time Munguia had stood up and was looking for her clothes. Appellant struck her once and she fell. Elizondo began to run, and when he turned around again he saw appellant hit Munguia three more times with the "tail" of the belt as she lay on the ground. Munguia died as a result of this severe beating.

The medical examiner testified that at the time of her death Munguia had a blood alcohol level of .20. He explained that "alcohol is a central nervous system depressant, and it affects everybody, but it may affect them in a different degree, depending on their tolerance." He agreed that some individuals at that level of intoxication would manifest "a loss of emotional control and/or have trouble walking and ... have slurred speech[.]" Some at that level would be unconscious. The medical examiner further testified that cocaine "adds" to or "potentiates the alcohol," although he agreed as "a general statement" that "it might take a person who was drunk or under the influence of alcohol and might at least temporarily perk them up or wake them up a little bit more than they might be had they not snorted the cocaine[.]" He also identified a wound on Munguia's right hand as a defensive wound, indicating she "had the physical

ability to try to protect herself from the blows as they were coming in[.]"

A toxicologist testified that cocaine was detected in Munguia's nasal cavity. Although cocaine was not found in her blood, the toxicologist explained that "[t]he level of cocaine one finds in the blood, let's say in the occasional user, is below the detection limits of the techniques we use." In an individual with a blood alcohol level of .20 one would expect the "ability to comprehend certain things might be affected," and he would have "a staggering gait, possibly drowsy, might experience some dizziness." "Someone who is not accustomed to drinking on a regular basis," he continued, "I think they could very well pass out at that level of .20." Munguia's mother later testified she had lived with Munguia her whole life, and had never seen her intoxicated. Nor had she seen Munguia drink liquor or ingest drugs.

To be sufficient the evidence must show not only that Munguia did not consent, which is to say she did not "assent in fact, whether express or apparent." Tex.Penal Code Ann. § 1.07(a)(9). As the jury was charged here, the evidence also had to show beyond a reasonable doubt that appellant knew she was "physically unable to resist." Appellant points to the cross-examination testimony of both Hanson and Elizondo to the effect that though Munguia did not actually resist sexual intercourse with appellant, each believed resistance was not impossible, and that she could have resisted had she wanted to. He asserts this evidence is uncontested, and thus the State failed to show beyond a reasonable doubt that appellant knew Munguia was physically unable to resist. We also note the medical examiner's testimony that Munguia apparently did resist the subsequent beating which caused her death. Nevertheless, we do not agree that the opinions of Hanson and Elizondo that Munguia was physically capable of resisting are dispositive of the question.

The concept of "resistance" has had a long history in the law of forcible rape in Texas. Under former penal provisions the amount of "force" necessary to render nonconsensual intercourse a rape was dependent upon the extent of resistance to be expected from the prosecutrix under the circumstances; such force "as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case." Texas Penal Code Ann. art. 1184 (1925). Thus, the requisite force was measured on a sliding scale, depending upon the nature and amount of resistance reasonably to be expected in the particular circumstances of a given case. See e.g., Brown v. State, 576 S.W.2d 820 (Tex.Crim.App.1978); Lewis v. State, 154 Tex.Crim. 329, 226 S.W.2d 861 (1950) (Opinion on appellant's motion for rehearing); Bundren v. State, 152 Tex. Crim. 45, 211 S.W.2d 197 (1948). Not surprisingly in the premises, sufficiency questions in forcible rape cases often focused more on the resistance to be expected than the amount of force actually used. Compare Killingsworth v. State, 154 Tex.Crim. 223, 226 S.W.2d 456 (1950), on retrial, Killingsworth v. State, 155 Tex.Crim. 511, 236 S.W.2d 794 (1951).

Under the 1974 Penal Code the connection between force and resistance was carried over into Tex.Penal Code Ann. § 21.02(b)(1) & (2), which defined lack of consent in terms of such compulsion, whether by force or threat, as would, respectively, "overcome[ ] such earnest resistance as might reasonably be expected under the circumstances[,]" and "prevent resistance by a woman of ordinary resolution[.]" [2] See Acts 1973, 63rd Leg., p. 916, ch. 399, § 1, eff. Jan. 1, 1974. But for the first time in express statutory form, § 21.-02(b)(3) defined lack of consent also in terms of a physical inability to resist. See Committee Comment following § 21.02, Texas Penal Code, A Proposed Revision, State Bar Committee on Revision of the

---

**2.** In 1975 this latter definition was amended to require such "threat, communicated by actions, words, or deeds, that would prevent resistance by a woman of ordinary resolution, under the same or similar circumstances, because of a reasonable fear of harm[.]" Acts 1975, 64th leg., p. 476, ch. 203, § 1, eff. Sept. 1, 1975.

Penal Code (Final Draft 1970), at 158.[3] This constitutes a legislative recognition that on the sliding scale, where no resistance is reasonably to be expected under the circumstances, no compulsion is necessary to translate sexual intercourse without express or apparent assent in fact into rape.

■ In 1983, § 21.02, *supra*, was recodified as Tex.Penal Code Ann. § 22.011. *See* Acts 1983, 68th Leg., p. 5312, ch. 977, § 3, eff. Sept 1, 1983. At this time the notion that the amount of compulsion necessary to constitute sexual assault should be measured by the degree of resistance to be expected under the circumstances was dropped from the statutory scheme. *See* § 22.011(b)(1) & (2), *supra*. Thus, "[b]y merely stating that, if the actor's use of physical force or violence compels the victim to submit, the 'without consent' standard is satisfied, the legislature has made it easier for the State to prove lack of consent." *Bannach v. State*, 704 S.W.2d 331, at 333 (Tex.App.—Corpus Christi 1986). Particularly in view of this legislative development, we are not inclined to be strict in construing the meaning of "physically unable to resist" in § 22.011(b)(3), *supra*. *See* Tex.Penal Code Ann. § 1.05(b); Tex.Gov't. Code Ann. § 311.023(1), (4) & (5). We hold that where assent in fact has not been given, and the actor knows that the victim's physical impairment is such that resistance is not reasonably to be expected, sexual intercourse is "without consent" under the sexual assault statute.

■ There was evidence Munguia was not a frequent drinker, and that her blood alcohol level was such that an inexperienced drinker might well have been close to unconscious. Based upon the testimony of the medical examiner and toxicologist, the jury would have been justified in believing the cocaine she ingested enhanced the impairing effect of the alcohol even as it simultaneously prevented her from passing out altogether. Elizondo testified Munguia could not walk without support when she left the house. According to Hanson's testimony, she nearly passed out, and had to be bodily carried under the bridge. Appellant had to hold her up as he undressed her. Hanson himself opined, unresponsively, that Munguia was "too drunk to" offer any resistance at this time. Although he later conceded that by "resistance" he meant such resistance as would not have been "easy to overcome," the jury could have found that because of the effects of her intoxication, Munguia could not reasonably have been expected to resist her assailants, and that appellant knew and took advantage of this fact.

Moreover, that appellant resolved to kill Munguia the moment she threatened to alert the police could reasonably be construed as demonstrating a consciousness of guilt on his part. He knew she had not assented, expressly or otherwise. Indeed, there is testimony that she told him repeatedly to stop; that she was crying and asking for help. There is nothing to suggest her pleas were feigned or insincere. Under these circumstances the jury could rationally have inferred that had Munguia been physically able to resist, she would have. That appellant perceived an immediate need to "get rid of" her is evidence he believed this to be the case.

In short, a rational jury could have discounted the opinions of Hanson and Elizondo as inconsistent with all the other evidence, and concluded beyond a reasonable doubt that appellant knew Munguia's physical impairment was such that resistance was not reasonably to be expected. The evidence was not lacking on this account. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We overrule appellant's first point of error.

---

3. At least one Texas case decided under the former statute had held that where the prosecutrix was asleep when carnal knowledge was initiated, the "force" necessary for rape was only such "as may be used in the act of copulation." *Payne v. State*, 40 Tex.Crim. 202, 49 S.W. 604 (1899). *See also Mooney v. State*, 29 Tex. App. 257, 15 S.W. 724 (1890) (The Court of Appeals observed in dictum, "When the woman is asleep there is no contest of strength, and hence no necessity for greater force than that ordinarily involved in the act.")

## II.

In his second point of error, appellant effectively raises a *Penry* claim.[4] Appellant contends the trial court erred in overruling his two requested charges on mitigating evidence at the punishment phase of the trial, thereby denying him due process of law.[5] The crucial question when reviewing the constitutionality of our sentencing scheme in reference to *Penry,* is whether the defendant's evidence can be placed before the sentencer, and the sentencer has a reliable means of giving mitigating effect to that evidence. *Graham v. Collins,* —— U.S. ——, ——, 113 S.Ct. 892, 901, 122 L.Ed.2d 260 (1993) ("[The Supreme Court does] not read *Penry* as effecting a sea change in this Court's view of the constitutionality of the former Texas death penalty statute; it does *not* broadly suggest the invalidity of the special issues framework.") In *Penry* the evidence presented was of mental retardation and childhood abuse. And "[a]lthough Penry's evidence of mental impairment and childhood abuse indeed had relevance to the "future dangerousness" inquiry, its relevance was *aggravating* only." *Graham,* —— U.S. at ——, 113 S.Ct. at 901. That is, our special issues did not allow a jury to give any mitigating effect to these factors, thereby preventing Texas jurors to consider whether the presence of these factors in any individual would lessen the moral blameworthiness of an individual.

■ Appellant presented the following mitigating evidence during the punishment phase of the trial:

1. Evidence that appellant dropped out of school in the eighth grade;

2. Evidence that appellant was raised by a single parent and grew up in a housing project;

3. Evidence of appellant's good behavior in jail; and

4. Evidence of appellant's religious conversion.

We will review each of these contentions.[6]

This Court has previously held that appellant's religious conversion in prison and his good behavior in jail are types of "mitigating" evidence which can be fully considered within the second special issue con-

---

**4.** Appellant's briefs on appeal were filed prior to the U.S. Supreme Court's decision in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The error was preserved for appeal. *Black v. State,* 816 S.W.2d 350 (Tex. Crim.App.1991).

**5.** Appellant's requested alternative instructions were:

> IX. Under the Constitution of the State of Texas and the United States Constitution, you are instructed that you must consider all the evidence in the case, including any aggravating factors and any evidence that mitigates against the imposition of the death penalty. That is, you must consider all evidence which has any bearing on the two special issues before you, but you must also consider any mitigating evidence or extenuating circumstances that might lead you to believe that the death penalty would not be appropriate.

> Therefore, if you find beyond a reasonable doubt that the answer to each special issues is "Yes", but you believe from all the evidence, including both aggravating and mitigating factors, that the death penalty is not appropriate in this case, you are instructed not to answer the special issues.

> X. (Only in the event IX. is not given) Under the Constitution of the State of Texas and the United States Constitution, you must take into consideration all of the evidence, whether aggravating or mitigating, if any, submitted to you in the trial of this case, includ-

ing all evidence before the Defendant was found guilty, and all evidence introduced at the second part of the trial, the penalty stage. You must consider all evidence, if any, that mitigates against the death penalty before answering the two special issues submitted to you.

**6.** Though appellant directs our attention to certain mitigating evidence, he fails to include the voluntary "intoxication" evidence raised by the dissent. The only evidence of intoxication was offered at the guilt phase of the trial. The record indicates that everyone, including appellant, became a "little drunk" or was "drunk," but the intoxication evidence was only examined further as to the victim. Appellant presented no evidence that he was an alcoholic, or that his intoxication, if any, at the time of the offense was such that it rose to the level of temporary insanity. *See* Tex.Penal Code Ann. § 8.04.

We are unwilling to determine whether the record is sufficient to support the dissent's view that the record conclusively or sufficiently demonstrates that *appellant* was intoxicated. Nevertheless, because the dissent does address the issue, we do note that this Court has held that intoxication can be fully considered within special issue number one. *Miniel v. State,* 831 S.W.2d 310, 320–321 (Tex.Crim.App.1992); *Goss v. State,* 826 S.W.2d 162, 167 (Tex.Crim.App. 1992) (plurality opinion).

cerning future dangerousness. Tex.Code Crim.Proc.Ann. art. 37.071(b); *Mooney v. State,* 817 S.W.2d 693, 706 (Tex.Crim.App. 1991); *Felder v. State,* 848 S.W.2d 85 (Tex. Crim.App.1992); *See Graham,* —— U.S. at —— – ——, 113 S.Ct. at 901–02. Had the jurors believed appellant's religious conversion was complete, and that in fact appellant had changed his life or that appellant's behavior in jail was so exemplary that it was a sufficient indica of whether he represented a future threat to society, the jury could have voted "no" to the second special issue on future dangerousness. Tex.Code Crim.Proc.Ann. art. 37.071(b). The jury was constitutionally permitted to consider any mitigating nature of this type of evidence within the special issue framework.

Appellant presents further evidence of his low education and single parent upbringing. During the punishment phase of the trial, appellant paints a picture of a boy growing up in a single family household in the projects—a boy who dropped out of school in the eighth grade. But despite all these setbacks, he received his G.E.D., got a job in the construction field and became a husband and a father. This evidence is particularly indicative of whether appellant represents a future threat to society. However, this evidence, when presented to a rational jury, neither tends to ameliorate fault, nor make this individual less death eligible than any member of our society under some notion of a "reasoned moral response." *See, e.g., Lackey v. State,* 819 S.W.2d 111, 134 (Tex.Crim.App.1991) (On motion for rehearing); *Ex Parte Ellis* 810 S.W.2d 208, 211–212 (Tex.Crim.App.1991).

■ Because appellant's mitigating evidence can be fully considered within the special issues presented to the jury, the trial court did not err in denying appellant's requested charge on mitigating evidence. Accordingly, appellant's second point of error is overruled.

### III.

In point of error three, appellant again complains the trial court erred in overruling his charge on mitigating evidence at punishment. Unlike the second point of

error, however, appellant complains solely of State constitutional violations, specifically a violation of the State "due course of law provision." Tex. Const. Art. 1 § 19. Therefore, we must independently examine the scope of our "due course of law provision."

■ Both parties before this Court concede we are at liberty to interpret our State constitution in a manner wholly inconsistent with the U.S. Constitution. In Texas, a defendant is guaranteed the maximum constitutional protections, whether their source is derived from the State or Federal constitutions. At times our constitution may provide more protections or less protections. However, regardless of which provides greater protection, each must be developed independently. *Heitman v. State,* 815 S.W.2d 681 (Tex.Crim.App.1991); *see, Long v. State,* 742 S.W.2d 302 (Tex. Crim.App.1987), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988), *overruled in part, Briggs v. State,* 789 S.W.2d 918 (Tex.Crim.App.1990).

Appellant contends that "mitigation of death" is analogous to what he considers the constitutional defenses of alibi, mistaken identity, and sudden passion, and that the jury must be instructed on these defenses. *See Arney v. State,* 580 S.W.2d 836 (Tex.Crim.App.1979) (panel opinion); *Wilson v. State,* 581 S.W.2d 661 (Tex.Crim. App.1979) (on rehearing) (en banc); *Cobarrubio v. State,* 675 S.W.2d 749 (Tex.Crim. App.1983), *overruled in part, Lawrence v. State,* 700 S.W.2d 208 (Tex.Crim.App.1985); respectively. We disagree with appellant's contention as well as his analogy.

■ Apparently, appellant relies on this Court's insistence that a jury be charged on certain subjects to support his proposition that failure to so instruct is a constitutional violation. While it is true that in certain instances, we have held that failure to instruct violates the due course of law provision, it is not true merely because the defensive theory is raised. *Cobarrubio,* 675 S.W.2d at 752. For instance, in *Cobarrubio,* this Court held that it is error for a trial court to fail to instruct a jury that

sudden passion is a defense to murder when voluntary manslaughter is also charged. *id.* However, this became a constitutional issue, not because the defensive issue of sudden passion was not charged, but rather because failure to instruct in *Cobarrubio* amounted to a *reduction* of the State's burden of proof and *that* violated a defendant's constitutional rights. *id.*

The Texas Constitution guarantees that, "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of the law of the land." Tex. Const. Art. I, § 19. "Due course of the law of the land" means "that punishment for a crime will be imposed only by and through a trial in accordance with law." *McFarlane v. State*, 158 Tex.Crim. 194, 254 S.W.2d 136, 137 (1953). In *Cobarrubio*, the punishment imposed was not in accordance with the law, that is, the State was permitted to lower its burden of proof. Neither *Arney* nor *Wilson, supra*, concern the "due course of law" provision contained in the State Constitution and therefore they do not support appellant's contention on appeal. Because the State's burden was not reduced and there was no showing that the punishment was not assessed by and through a trial in accordance with the law, appellant's third point of error is overruled.

## IV.

In appellant's fourth point of error, he contends the trial court erred in admitting State's exhibits 102 and 103 over his objection. These exhibits were admitted during the punishment phase of the trial as evidence relevant to the second special issue concerning "future dangerousness." Tex. Code Crim.Proc.Ann. art. 37.071(b). Exhibit 102 was an official copy of a complaint and judgment against "John W. Elliott," cause number 601,399, for Public Intoxication committed on February 3, 1978. Exhibit 103 was an official copy of a complaint and judgment against "John W. Elliott," cause number 601,400, for Disorderly Conduct committed on February 3, 1978.

A certified copy of the judgment and sentence standing alone were insufficient to prove the prior offense, prior to the enactment of Tex. H.B. 635, 70th Leg. (1987) and Tex. S.B. 60, 71st Leg. (1989). *Littles v. State*, 726 S.W.2d 26, 28–29 (Tex. Crim.App.1984); *Franklin v. State*, 154 Tex.Crim. 375, 227 S.W.2d 814 (1950). *See* Tex.Code Crim.Proc.Ann. art. 38.33 and 42.-01. However, in this case, the State also introduced records of the county jail including fingerprints of the defendant supported by expert testimony that the fingerprints match the defendant's. *Littles*, 726 S.W.2d at 32. The custodian of records for the Austin Police Department testified that the information contained within the "jail card" was made by an employee or representative with personal knowledge of the events or transactions contained in the booking sheet and the record was made at or near the time of the act or the event that's reflected therein. There is no objection on appeal to the admission of the jail card which identifies "John William Elliott" as being arrested on February 3, 1978 for two violations, namely "D.O.C. # 1" and "P.I.," cause numbers 601,399 and 601,400.

Appellant argues that exhibits 102 and 103 should be excluded because there was not sufficient information for the jury to infer that the person convicted of the offenses shown in the judgment is the same person shown in the jail card. We disagree. Appellant's argument goes to the weight of the evidence and was properly overruled by the trial court. The trial court's ruling was well within his discretion where the jail card admitted identifies a person with the same name as appellant, same cause of actions as illustrated in the judgments, committed on the same day as is indicated in the judgments, and the same violations as can be inferred from jail card. Personal knowledge that the cause numbers in the jail card are intended to correspond with the cause numbers on the judgment is not necessary. *See McGowan v. State*, 664 S.W.2d 355, 359 (Tex.Crim.App. 1984). Appellant's fourth point of error is overruled.

## V.

■ In point of error five, appellant complains of the jury charge at the punishment phase of the jury trial. Appellant's requested the following jury instruction:

> With respect to the first special issue, you are instructed that the word "deliberately" is to be given in (sic) its ordinary, everyday meaning. However, the word "deliberately" means more than just "intentionally," as that term was defined for you previously. That is, even though by your verdict of "guilty" you have already found that Defendant desired to cause death, you may not answer the first special issue "yes" unless you further believe beyond a reasonable doubt that he deliberately did so.

The trial court instructed the jury during punishment, that

> The word "deliberately" is to be given its ordinary, everyday meaning. However, the word "deliberately" means more than just "intentionally" as that term was defined for you previously.

> \*     \*     \*     \*     \*     \*

> (1) Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

Appellant argues that the charge given by the trial court does not tell the jury that its answer to the first special issue is dependent upon the distinction between deliberate and intentional conduct. We disagree. We see little difference between appellant's requested charge and the charge actually given. Because appellant's requested instruction comports with the actual instruc-

**7.** Our state constitution prohibits such an instruction in capital murder trials. Tex. Const. Art. 4 § 11; Tex.Code Crim.Proc.Ann. art. 37.07 § 4; *Boyd v. State,* 811 S.W.2d 105, 121 (Tex. Crim.App.1991).

**8.** The Briggs Instruction was incorporated into the California Penal Code as a result of a 1978 voter initiative. The California Code required the following instruction:

tion given at trial, appellant's fifth point of error is overruled.

## VI.

■ In the sixth point of error, appellant avers that the trial court erred in refusing his requested instruction on the Texas parole laws. Citing *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) and *King v. Lynaugh,* 828 F.2d 257 (5th Cir.1987), *vacated in part,* 850 F.2d 1055 (5th Cir.1988) (en banc), appellant contends the denial to so instruct violates the Eighth and Fourteenth Amendments of the U.S. Constitution. Not only is appellant incorrect as to the Federal Constitution, but it would violate the Texas Constitution to instruct the jury in such a manner.[7]

In *California v. Ramos,* the Supreme Court reviewed the California "Briggs Instruction," which instructed the California jury that the Governor had the power to commute or modify a sentence.[8] The California Supreme Court held the instruction violated the U.S. Constitution. The U.S. Supreme Court reversed, holding that the constitution did not prohibit the instruction, noting:

> Our conclusion is not intended to override the contrary judgment of state legislatures that capital sentencing juries in their States should not be permitted to consider the Governor's power to commute a sentence. [n. 30] It is elementary that States are free to provide greater protections in their criminal justice system than the Federal Constitution requires. We sit as judges, not as legislators, and the wisdom of the decision to permit juror consideration of possible commutation is best left to the States. We hold only that the Eighth and Four-

> You are instructed that under the State Constitution a Governor is empowered to grant a reprieve, pardon, or commutation of a sentence following conviction of a crime.

> Under this power a Governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole.

*Ramos,* 463 U.S. at 995–996, 103 S.Ct. at 3450–3451.

teenth Amendments do not prohibit an instruction.

[n. 30] See, *e.g.,* GaCode Ann. § 17–8–76 (1982) (prohibiting argument as to possibility of pardon, parole, or clemency).

Many state courts have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon, or parole. The basis of decision in these cases is not always clear—*i.e.,* it often does not appear whether the state court's decision appears to rest on an interpretation of the State's capital sentencing system and the division of responsibility between the sentencer and other authorities effected by that scheme. [Cites omitted.]

463 U.S. at 1013–1014, 103 S.Ct. at 3460.

Neither this Court nor the Fifth Circuit has interpreted *Ramos* in the manner articulated by appellant. Appellant directs our attention to a Fifth Circuit panel opinion whose pertinent portion was vacated. *King,* 850 F.2d 1055. While neither opinion in the Fifth Circuit holds precedential value for this Court, we are persuaded by the en banc opinion. The Fifth Circuit sitting en banc recognized the absence of any federal constitutional requirements concerning such an instruction. The Fifth Circuit noted:

We are further reluctant to require asymmetrical constitutional requirements for voir dire and the jury deliberations because of the Supreme Court's determination that a jury instruction on a capital defendant's eligibility for parole or commutation of sentence does not raise a constitutional issue. [*Ramos, supra*].

850 F.2d at 1061. Accordingly, the trial court properly refused to instruct the jury on the parole laws in Texas at the punishment stage of a capital case. *Jones v. State,* No. 69,894 (Tex.Crim.App. September 23, 1992); *Boyd v. State,* 811 S.W.2d 105, 121 (Tex.Crim.App.1991). Appellant's sixth point of error is overruled.

## VI.

We have permitted appellant to file a Pro Se Supplemental Brief in this cause. His brief is identical in all respects, except in name and cause numbers, to a supplemental pro se brief previously addressed by this court in *Draughon v. State,* 831 S.W.2d 331, 337–38 (Tex.Crim.App.1992). We find the disposition of the identical points of error in *Draughon* are controlling in this cause, and appellant's pro se supplemental points of error are overruled.

The points of error raised in appellant's brief and appellant's pro se supplemental brief are overruled. Therefore, we affirm the judgment of the trial court and the sentence of death in this cause.

BAIRD, J., concurs in the disposition of the first and third points of error, dissents to the inclusion of footnote one, and otherwise joins the opinion.

MALONEY, J., concurs in parts II and III and otherwise joins the opinion.

CLINTON, Judge, dissenting.

## I.

In his second point of error appellant argues the trial court erred in failing to instruct the jury that it could assess a penalty less than death, irrespective to its answers to the special issues under Article 37.071(b), V.A.C.C.P., should it find that mitigating circumstances so warrant. Thus, although briefs in this cause were filed before the United States Supreme Court's decision in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), appellant effectively raises a *Penry* claim.

Appellant requested an instruction that should the jury find affirmative answers to special issues, "but believe from all the evidence, including both aggravating and mitigating factors, that the death penalty is not appropriate in this case, you are instructed not to answer the special issues." This would have the effect, of course, of assuring imposition of a life sentence. Article 37.071(e), V.A.C.C.P. Such a request was adequate to alert the trial court to the deficiency in the charge—if there was one. That depends upon whether evidence was presented having mitigating value beyond

the pale of special issues. At any rate, even had appellant not requested an instruction, under Judge Campbell's concurring opinion in *Black v. State*, 816 S.W.2d 350 (Tex.Cr.App.1991), in which a majority of the Court joined, appellant need not have preserved this error in order to raise it on appeal. See also *Selvage v. Collins*, 816 S.W.2d 390 (Tex.Cr.App.1991) (Opinion on Certified Question from the United States Court of Appeals for the Fifth Circuit). The majority therefore appropriately proceeds to the merits of appellant's claim.

First, appellant presented testimony that while in jail pending trial in the instant cause he was well-behaved, and suffered no disciplinary actions. He was described as a "fine inmate." Although this constitutes "mitigating" evidence in the Supreme Court's scheme of things, *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), it appears that a majority of that Court considers our second special issue adequate to accommodate its full mitigating significance. *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring). Also while in jail appellant "made a profession of faith to Christ," and the minister who so testified also opined that appellant "is a different person now than he's ever been in his life." Thus we have at least minimal evidence of "religious devotion [that] might demonstrate [a] positive character trait[ ] that might mitigate against the death penalty." *Id.*, 487 U.S. at 186, 108 S.Ct. at 2333, 101 L.Ed.2d at 173. Although we may doubt the sincerity of appellant's jailhouse conversion, that is a question for the sentencer to address in the first instance.

Appellant was one of six children raised by a single mother in a housing project in East Austin. He had not seen his father since his parents divorced when he was six years old. This constitutes some evidence of a "disadvantaged background." *Penry v. Lynaugh*, 492 U.S. at 319, 109 S.Ct. at 2947, 106 L.Ed.2d at 278, quoting *California v. Brown*, 479 U.S. 538, at 545, 107 S.Ct. 837, at 841, 93 L.Ed.2d 934, at 942 (1987) (O'Connor, J., concurring).

Finally, the record at the guilt phase of trial shows appellant, along with everyone else involved in this offense, was "drunk" at the time. Unlike, e.g., *Gardner v. State*, 730 S.W.2d 675, at 678 (Tex.Cr.App. 1987), the instant record does not reveal appellant intentionally ingested a mind-altering substance in order to pluck up his courage to commit this offense. Instead, it appears appellant first conceived of the offense while under the influence of alcohol. This is a circumstance a jury might be persuaded ameliorates fault, at least to the extent that, taken alone or in combination with other mitigating factors, it counsels a punishment less than death. Such evidence need not rise to the level of showing "temporary insanity," V.T.C.A. Penal Code, § 8.04, before it may have mitigating value under *Penry*. See *Tucker v. State*, 771 S.W.2d 523, at 533–34 (Tex.Cr.App.1988).

In *Bell v. Ohio*, 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978) (Plurality Opinion), a companion case to *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (Plurality Opinion), the United States Supreme Court invalidated the death sentence of a capital defendant on the basis that the Ohio capital sentencing statute then in effect did not allow independent mitigating significance to certain types of evidence proffered in those cases. One of the factors present in *Bell* but not given mitigating value under the Ohio statute was the fact that the accused "had allegedly been using mescaline on the night of the offense." 438 U.S. at 640, 98 S.Ct. at 2980, 57 L.Ed.2d at 1015. The underpinnings of *Lockett* and *Bell* were adopted by a majority of the Supreme Court in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

It is true that intoxication will be a relevant consideration in answering the first special issue pertaining to deliberateness. But what the Court observed in *Penry* vis-a-vis mental retardation has application in the context of intoxication:

"Penry's mental retardation was relevant to the question whether he was capable of acting 'deliberately,' but it also 'had relevance to [his] moral culpability be-

yond the scope of the special verdict questio[n].' Franklin, 487 U.S. [164] at 185, 101 L.Ed.2d 155, 108 S.Ct. 2320 [at 2333] [ (1988) ]. Personal culpability is not solely a function of a defendant's capacity to act 'deliberately.' A rational juror at the punishment phase of the trial could have concluded, in light of Penry's confession, that he deliberately killed Pamela Carpenter to escape detection. Because Penry was mentally retarded, however, and thus less able than a normal adult to control his impulses or to evaluate the consequences of his conduct, ... the same juror could also conclude that Penry was less morally 'culpable than defendants who have no such excuse,' but who acted 'deliberately' as that term is commonly understood. *California v. Brown*, 479 U.S. [538] at 545, 93 L.Ed.2d 934, 17 [107] S.Ct. 837 [at 841] [ (1987) ] (concurring opinion)."

492 U.S. at 322–23, 109 S.Ct. at 2949, 106 L.Ed.2d at 280–81. Likewise, a rational juror could decide that, notwithstanding his intoxication, appellant killed Joyce Munguia in the instant cause deliberately in order to escape detection. Punishment evidence showed appellant was on probation at the time and had every incentive to conceal the rape. But at the same time that juror could rationally conclude that because of his intoxication, with the accompanying impairment of judgment and impulse control, appellant was less morally culpable than would have been a sober man committing the same crime.

Under the holdings of *Bell, Lockett, Eddings* and *Penry*, all supra, that intoxication may be given some mitigating effect in the context of special issues is not sufficient. Such considerations as age and intoxication were relevant to the statutorily circumscribed mitigating factors in Ohio in 1978 as well. But just as in Ohio then, jurors in Texas today must be able to consider intoxication, in and of itself, as a justification for a sentence less than death.

The jury in this cause was in no way empowered to give effect to the above evidence to the extent it had mitigating "relevance" outside the reach of special issues. Absent an instruction along the lines of the one appellant requested here, he cannot be sentenced to death consonant with the Eighth Amendment. *Penry v. Lynaugh*, supra. We should therefore sustain appellant's second point of error.

## II.

The majority's treatment of appellant's second point of error is kind of a hodgepodge of rationales. At one point it seems to embrace the notion that appellant has not established a "nexus" between his evidence proffered in mitigation and the crime itself. At 486–87. My aversion to this approach is by now well documented. E.g., *Lackey v. State*, 819 S.W.2d 111, at 138 (Tex.Cr.App.1991) (On appellant's motion for rehearing) (Clinton, J., dissenting); *Goss v. State*, 826 S.W.2d 162, at 169 (Tex. Cr.App.1992) (Clinton, J., dissenting); Ex parte Bower, 823 S.W.2d 284, at 291 (Tex. Cr.App.1991) (Clinton, J., dissenting). At other points the majority seems to apply the revisionist view of *Penry* that was recently offered up by a majority of justices on the United States Supreme Court (not one of whom was part of the majority in *Penry* itself) in *Graham v. Collins*, —— U.S. ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993). That is to say, the majority here seems to hold that because appellant's evidence can be given *some* mitigating significance in context of the Article 37.071(b) special issues, no further instructions are necessary to satisfy the Eighth Amendment. In fairness, it may be that all the majority has done is to decide, by way of this Court's homemade "nexus" requirement, that the only mitigating significance appellant's evidence *has* may be "fully considered within the special issues[.]'" At 486–87. Nevertheless, the majority's citation to *Graham* is troubling, in the same way that prior intimations by this Court that mitigating evidence that may be accommodated at least partially under the special issues will not call for an additional jury instruction under *Penry* are troubling. E.g., *Black v. State*, 816 S.W.2d 350, at 365 (Tex.Cr.App.1991); *Boggess v. State*, 855 S.W.2d 645, 647 (Tex.Cr.App.1991); *Richardson v. State* (Tex.Cr.App., No. 68,934,

delivered June 12, 1991) (Clinton, J., dissenting) (Slip op. at 1–2). I continue to believe "this is precisely the view the Supreme Court put to rest in *Penry.*" *Richardson*, supra, at 1–2, n. 1.

### A.

In *Graham* the Supreme Court was presented with the question whether evidence of a defendant's relative youth called for the additional instruction recognized in *Penry.* Because Graham's claim was presented in a federal petition for habeas corpus, however, the Court was confronted with the threshold question whether a holding that the Eighth Amendment requires an additional instruction to accommodate the full mitigating effect of evidence of youth would constitute the announcement of a "new rule," something the Court has declined to do in federal habeas corpus appeals since its decision in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). A majority of the Supreme Court held that such a holding would in fact announce a new rule, and therefore declined to reach the merits of Graham's contention. Whether the Supreme Court will ultimately adopt the "new rule" Graham sought, of course, remains an open question. *Gunter v. State*, 858 S.W.2d 430 (Tex.Cr.App.1993) (Clinton, J., dissenting) (At 450, n. 3).[1]

In coming to the decision that Graham was asking for a new rule, the Supreme Court seems to have re-invented *Penry*, relying upon the joint opinion in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and the plurality opinion in *Franklin v. Lynaugh*, supra. The majority construed *Jurek* to hold without qualification that under our special issues mitigating evidence such as youth is "given constitutionally adequate consideration[.]" — U.S. at ——, 113 S.Ct. at 899. Moreover, the majority read *Lockett v. Ohio*, supra, to bolster this view, and ob-

served that "*Eddings* signaled no retreat" therefrom. *Id.* Thus, the Court concluded, as of 1984 when Graham's conviction became final, the notion that an additional instruction might be required to guarantee constitutionally sufficient scrutiny of his mitigating evidence would constitute a "new rule" for *Teague* purposes. If true, this conclusion should have been dispositive of the case. The *Graham* majority continued, however, to observe at some length that in its view nothing in the Supreme Court's cases after 1984, including *Penry*, would alter this conclusion. Apparently the Court believed it was constrained to continue in this vein in order to explain how Graham could be found to be asking for a "new rule" in 1984, when Penry was *not* in 1986, given that there was no relevant caselaw in the interim.

In *Franklin* the plurality had opined that "*Lockett* does not hold that the State has no role in structuring or giving shape to the jury's consideration of ... mitigating factors." 487 U.S. at 179, 108 S.Ct. at 2330, 101 L.Ed.2d at 169. Continuing its analysis, the *Graham* majority quoted this passage from *Franklin*, and another from its (post-*Penry* ) opinion in *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), to the effect that *Lockett* and *Eddings* do not purport to delimit the State's ability to define "the manner in which ... mitigating evidence may be considered." 494 U.S. at 491, 110 S.Ct. at 1262, 108 L.Ed.2d at 426. From this premise the majority reasoned that as long as the statutory special issues will accommodate a defendant's proffer of mitigating evidence to *some* extent, it cannot clearly be said that *Lockett* and *Eddings*, or even *Penry*, call for an additional instruction. This is so, presumably, because the Legislature has legitimately prescribed "the manner in which [the] mitigating evidence may be considered"—or, at least, because *Lockett, Eddings*, and *Penry* do not hold that the Legislature may *not* legitimately prescribe "the manner in which [the] mitigating evidence may be considered." Ac-

1. The Supreme Court has since granted certiorari in a case from direct appeal in this Court presenting the same issue on the merits as that in *Graham*. See *Johnson v. Texas*, — U.S. ——, 113 S.Ct. 1148, 122 L.Ed.2d 499 (5653, cert. granted 1993).

cordingly the majority in *Graham* was able to opine:

> "In *Penry*, the defendant's evidence was placed before the sentencer but the sentencer had no reliable means of giving mitigating effect to that evidence.[2] In this case, however, Graham's mitigating evidence was not placed beyond the jury's effective reach. * * * Even if Graham's evidence, like Penry's, had significance beyond the scope of the first special issue, it is apparent that Graham's evidence—*unlike* Penry's—had mitigating relevance to the second special issue concerning his likely future dangerousness. Whereas Penry's evidence compelled an affirmative answer to that inquiry, despite its mitigating significance, Graham's evidence quite readily could have supported a negative answer. This distinction leads us to conclude that neither *Penry* nor any of its predecessors *dictates* the relief Graham seeks within the meaning required by *Teague*."

— U.S. at ——, 113 S.Ct. at 902 (emphasis in the original). Thus the Court purported to explain that even though Penry was not asking for a "new rule" in 1986, Graham, in 1984, *was*.

Of course this explanation is absurd. If it is true that Graham was asking for a "new rule" in 1984 because at that time, under *Jurek*, reasonable minds could have disagreed whether our capital murder statute failed to embrace the entire range of constitutionally relevant mitigating evidence, then the conclusion is inescapable that Penry was also asking for a "new rule" in 1986. To be able to distinguish *Graham* from *Penry* on the basis that *Lockett* does not indicate that the States may not regulate the *manner* in which mitigating evidence may be considered, as opposed to the *scope* of what may be considered constitutionally mitigating, see *Saf-*

*fle v. Parks*, supra, would not matter. If *Lockett* did not affect *Jurek*'s unqualified endorsement of Article 37.071, then the distinction between manner and scope is wholly immaterial. Reasonable minds could differ whether an additional jury instruction was required under *any* circumstances. *Penry* was simply wrong to decide that the rule requested there was not "new" for purposes of federal habeas cognizability, under *Teague*. There would be no need to distinguish *Penry*; only to overrule it, and explain away *stare decisis*.

The view of the *Graham* majority, however, that as of 1984 *Jurek* could support the proposition that Article 37.071 was sufficient to cover all constitutionally relevant mitigating evidence is not only inconsistent with *Penry* itself, it is demonstrably incorrect. Moreover, even assuming the purported distinction between Graham's rule and Penry's rule—that the former goes to *manner* of considering mitigating evidence, while the latter goes to *scope*—were material, it is likewise insupportable. Indeed, it is not altogether too cynical to suspect that the entire *Graham* enterprise was meant to serve no other purpose than to lay the groundwork for a *full scale retreat* from the principle underlying *Penry*. In any event, *Graham* is pure revisionism.

**B.**

The *Graham* majority distorts *Jurek* to say that it held that our special issues were broad enough to embrace all constitutionally mitigating evidence. *Jurek* addressed an Eighth Amendment challenge to our capital murder scheme on its face. The joint opinion of Justices Stewart, Powell, and Stevens found that V.T.C.A. Penal Code, § 19.03 provided sufficient narrowing to guide a capital jury's discretion in deciding when a death sentence should be imposed, as required by *Gregg v. Georgia*,

---

**2.** This statement is simply inaccurate. Penry's retardation might have caused a jury to answer the first special issue, inquiring as to the deliberateness of his conduct, negatively. This most certainly counts as a "reliable means of giving mitigating effect to that evidence." The point that Justice O'Connor was making in *Penry* is that even if a jury does *not* find mental retarda-

tion a sufficient basis to answer the first special issue "no," it must still be given the means to exercise its reasoned moral judgment to conclude that retardation nevertheless justifies imposing a sentence less than death. See *Id.*, 492 U.S. at 322–23, 109 S.Ct. at 2949, 106 L.Ed.2d at 280–81. This point, like so many others, seems to have been lost on the *Graham* majority.

428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The joint opinion also found that special issues in Article 37.071 provided a basis for a capital jury to decide when a death sentence should *not* be imposed, as required by *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). It is true that the joint opinion observed that under the special issues "the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it." *Jurek,* supra, 428 U.S. at 273, 96 S.Ct. at 2957, 49 L.Ed.2d at 939. However, this should not be read—indeed, it cannot be read—as a holding that our special issues are broad enough in scope to cover all constitutionally mitigating evidence. Because the United States Supreme Court does not interpret state law, it could not be understood to construe the parameters of our special issues. This is why the Supreme Court in *Penry* observed that the holding in *Jurek* that our death penalty scheme is facially constitutional was contingent upon assurances it found in our as-yet limited capital jurisprudence that we would interpret special issues broadly, in such a way as to embrace all constitutionally relevant mitigating evidence.

"Although the various terms in the special questions had yet to be defined, the joint opinion concluded that the sentencing scheme satisfied the Eighth Amendment on the assurance that the Texas Court of Criminal Appeals would interpret the question concerning future dangerousness so as to allow the jury to consider whatever mitigating circumstances a defendant may be able to show, including a defendant's prior criminal record, age, and mental or emotional state. *Id.,* at 272–273, 49 L.Ed.2d 929, 96 S.Ct. 2950 [at 2956–2957]."

*Penry v. Lynaugh,* supra, 492 U.S. at 316, 109 S.Ct. at 2945–2946, 106 L.Ed.2d at 277.

*Lockett* did not undercut this understanding of *Jurek,* but rather "underscored" it. *Penry,* supra, U.S. at 317, 109 S.Ct. at 2946, 106 L.Ed.2d at 277. There the Supreme Court in discussing *Jurek* observed that our capital sentencing scheme passed Eighth Amendment muster:

"because three Justices concluded that the Texas Court of Criminal Appeals had broadly interpreted the second question—despite its facial narrowness—so as to permit the sentencer to consider whatever mitigating circumstances the defendant might be able to show. [internal quote omitted] * * * None of the statutes we sustained in *Gregg* and the companion cases *clearly operated at that time* to prevent the sentencer from considering any aspect of the defendant's character and record or any circumstances of his offense as an independently mitigating factor."

*Lockett,* supra, 438 U.S. at 607, 98 S.Ct. at 2966, 57 L.Ed.2d at 991 (emphasis supplied). The *Lockett* plurality then went on to point out that while the Ohio capital sentencing statute then extant allowed for guided jury consideration of certain mitigating factors, such as age, prior criminal record, and the defendant's relatively minor role in the crime, these factors "would generally not be permitted, as such, to affect the sentencing decision." *Id.,* U.S. at 608, 98 S.Ct. at 2967, 57 L.Ed.2d at 992. That is to say, it is not enough that these factors had some bearing on statutorily circumscribed mitigation. Under *Woodson* they must be afforded whatever independent mitigating weight they carry.

That facial constitutionality of Article 37.071 is contingent upon a broad reading of special issues is further "underscored" by the Florida analogue. In *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), handed down along with *Jurek, Gregg,* and *Woodson,* the Supreme Court also upheld the facial validity of the Florida capital murder scheme. That scheme provided for jury weighing of statutory aggravating factors against statutory mitigating factors in deciding propriety of the death penalty. Its verdict was advisory only; the trial court was then to make the final determination of sentence, based upon its own weighing of aggravating against mitigating circumstances. In a footnote the joint opinion observed that, although the language in the Florida statute defining aggravating factors was ex-

pressly exclusive, the enumeration of mitigating factors was not. *Proffitt, supra,* U.S. at 250, n. 8, 96 S.Ct. at 2965–2966, 49 L.Ed.2d at 922. This distinction was critical to the observation in *Lockett* that none of the statutes "sustained in *Gregg* and the companion cases clearly operated at that time" to limit the jury's access to relevant mitigating evidence. 438 U.S. at 606–607, 98 S.Ct. at 2965–2966, 57 L.Ed.2d at 991. When in fact the Florida statute was interpreted by a Florida trial court as exhausting the field of relevant mitigating factors, the Supreme Court was quick to reverse that conviction as incompatible with the Eighth Amendment—on the strength of *Lockett* and *Eddings,* of course! *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

From all this it is clear that the *Graham* majority was mistaken to believe that as of 1984 the claim that an additional instruction was needed to accommodate whatever mitigating value youth may have beyond the scope of special issues was a "new rule." That rule would derive as readily from *Lockett* and *Eddings* in 1984 as did the Supreme Court's holding in *Hitchcock* in 1987. For that matter it would derive just as readily in 1984 as it did in 1989, in *Penry.* See *Graham v. Collins, supra,* —— U.S. at ——–——, 113 S.Ct. at 919 (Souter, J., dissenting) To hold that even in 1984 *Jurek* could reasonably have been read to stand for the proposition that Article 37.-071 will invariably cover the whole gamut of constitutionally relevant mitigating evidence is simply to ignore the significance of *Lockett* and *Eddings.* For even in 1984 it was clear that the optimism of the Justices who comprised the joint opinion in *Jurek* that this Court would construe the special issues expansively had been disappointed in practice. See *Stewart v. State,* 686 S.W.2d 118, at 125–126 (Tex.Cr.App. 1984) (Clinton, J., dissenting).

### C.

In *Franklin* a plurality opined that *Lockett* does not prevent the State from "structuring or giving shape to the jury's consideration of ... mitigating factors." 487 U.S. at 179, 108 S.Ct. at 2330, 101 L.Ed.2d

at 169. *Saffle v. Parks* construes *Lockett* to speak only to what constitutes constitutionally mitigating evidence, not the question whether the State may limit the manner in which such evidence is to be considered. The majority in *Graham* builds upon this distinction to hold that a statutory scheme that gives *some* effect to evidence proffered in mitigation of capital punishment, even if not the *full* mitigating effect that evidence may have, does not clearly fail to satisfy the Eighth Amendment, even after *Penry* itself. To me the distinction is an illusory one, and not supported by a fair reading of *Lockett.*

In *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), a majority of the Supreme Court observed that, consonant with its prior Eighth Amendment jurisprudence:

> "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the [death] penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant."

*Id.,* U.S. at 306, 107 S.Ct. at 1774, 95 L.Ed.2d at 287. This description emanated from earlier holdings in *Lockett* and *Woodson.* In the latter the Court had declared:

> "A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind."

428 U.S. at 304, 96 S.Ct. at 2991, 49 L.Ed.2d at 961. Echoing *Woodson,* the Court in *Lockett* reasoned that:

> "a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of fac-

tors which may call for a less severe penalty."

438 U.S. at 605, 98 S.Ct. at 2965, 57 L.Ed.2d at 990. These passages make clear that the sentencer must be made aware of and allowed to respond to any and all evidence a capital defendant may proffer that suggests a sentence less than death may be appropriate in his case. Under the Eighth Amendment, the State is not at liberty to say otherwise.

There is no real difference between the State allowing only a certain kind of evidence to be considered mitigating, and limiting "the manner in which ... mitigating evidence may be considered." *Saffle*, supra. After all, we cannot tell whether evidence *is* of a mitigating kind without knowing something of the *manner* in which a sentencer might consider it. Moreover, sometimes the same item of evidence can be viewed in more than one mitigating light; it may touch a sentencer's "reasoned moral judgment" at more than one place. To permit the State to limit the manner in which mitigation may be considered is, in a very real sense, to permit it to limit the scope of mitigating evidence. Effectively instructing the sentencer to direct its deliberation to less than every mitigating facet an item of evidence may comprise authorizes imposition of a sentence of death on consideration of less than all of "the diverse frailties of humankind." It denies that evidence "independent mitigating weight." It ignores relevant "factors which may call for a less severe penalty" than death.

Justice Scalia, a member of the *Graham* majority, has elsewhere acknowledged that what he calls the "*Woodson/Lockett* principle" prohibits the State from regulating the manner of jury consideration of mitigating evidence. In his dissenting opinion in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), he describes the import of that principle, albeit in derogation, in the following terms:

"*Whatever* evidence bearing on the crime or the criminal the defense wishes to introduce as rendering the defendant less deserving of the death penalty must be admitted into evidence and considered by the sentencer. * * * *Nor may States channel the sentencer's consideration of this evidence by defining the weight or significance it is to receive—for example, by making evidence of mental retardation relevant only insofar as it bears on the question whether the crime was committed deliberately*, see *Penry v. Lynaugh*, [supra]. Rather, they must let the sentencer 'give effect,' *McKoy v. North Carolina*, 494 U.S. 433, 443, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 [381] (1990), to mitigating evidence *in whatever manner it pleases*."

*Id.*, U.S. at 663–664, 110 S.Ct. at 3062–3036, 111 L.Ed.2d at 535 (first emphasis in the original; latter emphases supplied).

*Lockett* itself illustrates the point that evidence proffered in mitigation may not be constitutionally confined to only partial mitigating effect. There it was recognized that Lockett's age was at least relevant to determining the existence of the statutorily prescribed mitigating circumstances. Nevertheless, because, *inter alia*, age could not be considered a mitigating factor in its own right, an Eighth Amendment infirmity was found. In the premises, notwithstanding *Franklin* and *Saffle*, whether Texas may limit the "manner" of considering youth to its relevance to the special issues does not appear to be an open question. *Lockett* answers it with a definitive "no."

Although not a ruling on the merits, the majority opinion in *Graham* encourages this Court to hold that as long as mitigating evidence may be given some impact under the special issues, no additional jury instruction need be given under *Penry* even if that evidence has other mitigating significance beyond the scope of the special issues. That is a distortion of *Penry* and its precursors all the way back to *Woodson*—albeit one already suggested in some of our own caselaw. See cases cited *ante* at 492–93. To the extent it may continue to embrace that distortion today, the majority in this cause errs. In any event, appellant's second point of error should be sus-

tained. Because the majority does not, I respectfully dissent.