Jaime SUAREZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–93–259–CR.

Court of Appeals of Texas,
Corpus Christi.

May 31, 1995.

Charles A. Banker, III, McAllen, for appellant.

Theodore C. Hake, Asst. Crim. Dist. Atty., Edinburg, Rene Guerra, Dist. & County Atty., Edinburg, for appellee.

YAÑEZ, Justice.

## OPINION ON MOTION FOR REHEARING

A jury found appellant, Jaime Suarez, guilty of sexual assault and assessed punishment at ten years' probation.[1] By three points of error, appellant challenges his conviction. Appellant complains that there is insufficient evidence to establish that the complainant did not consent or that she was physically unable to resist. Appellant also asserts that the introduction of extraneous testimonial evidence was error. We affirm.

Appellant is a licensed lay midwife with offices at the McAllen Maternity Clinic in Hidalgo County. On January 30, 1992, Evangeline Garcia went to the McAllen Maternity Clinic. Garcia had an appointment to see Suarez for a prenatal examination. Suarez called Garcia from the waiting room and led her to the examination room, where he first asked her some medical history questions. Suarez asked Garcia how many children she had, whether she had planned this pregnancy, commented on how "very young looking" she kept herself, and if she was married.[2] Appellant then told her to go behind a curtain, take off her clothes, and put on a hospital gown open to the front. Garcia then sat at the foot of the examination table, holding her gown closed. The examination table was located in a corner of the room with the head and one side of the table against the wall. Garcia told Suarez she was nervous, and Suarez, with his hand inside her thigh, responded, "it's okay, I'll take care of you." At the time, Garcia thought "he [was] just trying to be nice and like, just trying to comfort—I don't know—Like, don't be scared."

Suarez then told her to lie back on the examination table and put her arms behind her head so that he could conduct a breast examination. With one hand still on her breast, Suarez showed her a little card on breast cancer and told her how important it was to perform routine checks for tumors. Standing alongside the table, Suarez then conducted the breast examination with the gown completely open. Garcia testified that Suarez told her, "you are truly beautiful." When asked how she felt after this comment, Garcia stated, "it was just an examination and usually all those are just uncomfortable, you know."

---

1. The State charged appellant with committing sexual assault, alleging that the complainant was "physically unable to resist" and "unaware that the sexual assault was occurring." Tex.Penal Code Ann. §§ 22.011(a)(1)(A), (b)(3), and (b)(5) (Vernon Supp.1994). At trial, the State elected to proceed only under the "physically unable to resist" theory.

2. The record reflects that most of the conversation between Garcia and Suarez was in Spanish.

After conducting the breast examination, Suarez placed a Doppler monitor on Garcia to hear the baby's heartbeat. Suarez then told her that he could not find a heartbeat and that she was not twelve weeks pregnant as she had suspected. Garcia testified that she became scared and that she asked herself, "how come he couldn't find a heart beat?" Suarez then said he would check her uterus and told her to place her legs on the stirrups. Garcia testified that she had felt "[i]t was going to be over with sometime soon" and was concerned because Suarez could not hear the baby's heartbeat. During the pelvic examination, Garcia was conscious and aware of the examination.

Regarding appellant's conduct while her heels were in the stirrups, Garcia testified that

A: He put his—his hand in the—my vagina to check what he said was the bladder. And he pressed down. He asked me if it hurts.

Q: And did you answer him?

A: I said, no.

Q: And then what did he do next?

A: Then he moved his hand to another side and pressed again and asked me if it hurt again. And I said, no.

Q: And at this point, did you tell him anything?

A: No.

Suarez then asked Garcia if she was sexually active with her husband. When she answered "yes," he told her not to be with him three days prior to her next visit. He also asked her if she enjoyed having sex with her husband. Garcia did not answer the question. All this time, Suarez still had at least two fingers inside her. According to Garcia, Suarez then pressed in deeper with his hand and it was uncomfortable. He asked Garcia if she and her husband had rough sex "because he could feel like there was something torn like—like a hernia or something." Garcia testified that she was still in the stirrups and that Suarez was standing at the side of the examination table.

Garcia then testified as follows:

Q: At that point, did you think something was wrong?

A: I got scared. I asked him if I was pregnant or was it a tumor or something was wrong.

Q: Now, when you're saying you got scared, were you scared because he—you thought you had a tumor or something, or were you scared for some other reason?

A: His face showed like he was noticing something was wrong, his face expressions, when I was looking at him.

\* \* \* \* \* \*

Q: And at this point, what was Mr. Suarez doing with his hand?

A: He had it inside me and was pulling in and out and in an up-and-down motion.

Q: Was this more than once?

A: Yes.

Q: More than twice?

A: Yes.

Q: Did he do this repeatedly?

A: Yes.

Garcia testified that Suarez's other hand was at the pubic hairline on her stomach and that the hand inside her vagina had touched her clitoris more than three times. Garcia stated that she felt that this was wrong, but that she was scared he could do something to the baby since he could touch her uterus. According to Garcia, "I said, if I move, he'll pull something out." The State elicited further testimony from Garcia concerning this part of the examination.

Q: Did you ever tell him to stop?

A: I turned towards the wall and just froze.

Q: Were you able to move at that point?

A: No.

Q: Were you able to cry out?

A: No. I just went into a daze.

Q: Were you able to resist?

A: I just froze.

Q: And where was his hand at this time?

A: Still inside.

Q: Had you consented for him to do that?

A: No.

At this point, Suarez was still standing on the long side of the examination table with one hand inside Garcia's vagina and the other on her pubic hairline. Garcia claimed that when Suarez noticed that she was not responding to what he was doing and that she was looking towards the wall, he stopped and pulled out his hand. Garcia testified that she tried to sit up, but that Suarez told her he was not yet done. Suarez then "backed up into the sink, the trash can at the sink, and took his hand to his face, and said how well it smelled."

Garcia recounted that Suarez then performed a test with a reflex hammer. During the reflex examination, Suarez told Garcia that her legs were too big and he demonstrated with his hand, warm water and a sponge how to take care of them. Suarez also told her that if she had problems with being bigger, fatter, or overweight, he would put her up somewhere and take care of her if nobody else wanted her.

After the reflex examination, Garcia got off the table and dressed as fast as she could. Garcia testified that, during the entire examination, the examination room door was closed and that no one else was in the room. Garcia estimated that she was in the examination room with Suarez for approximately forty-five to fifty minutes. Garcia left the clinic at approximately 6:50 p.m.

On cross-examination, Garcia admitted that her arms were not tied down and that she was able to move her arms when Suarez was standing alongside her with his hand on her stomach. Garcia, nevertheless, stated that she did not feel she could have raised herself up because she "was scared he could pull something because his hand, he never pulled out his hand."

The State also offered the testimony of Dr. Charles Ike Austin, a private physician practicing in Mission. Dr. Austin examined Garcia six weeks after her visit to Suarez's office, and he later delivered her baby. Dr. Austin testified that 1) a pelvic examination takes no more than forty-five seconds, 2) a nurse is always present when he conducts this type of examination, and 3) after examining Garcia he found no problems. Dr. Austin testified that he found no indication of pelvic relaxation or a prolapsed uterus.

The evidence also includes the testimony of Sister Patricia Deblieck, a certified nurse midwife with the Hidalgo County Health Department. Sister Patricia explained the procedure she uses when performing a prenatal examination on a patient. After detailing some initial procedures, including obtaining a medical history and vital sign information, Sister Patricia outlined the procedure she uses in performing a pelvic examination. According to Sister Patricia, there is no reason to touch a patient's breasts while conducting a pelvic examination. Sister Patricia testified that she stands between the patient's legs during the examination, yet someone with different training might stand alongside the patient. When asked whether it would ever be necessary to stand on the right side of the patient in her thirteenth week of pregnancy and to have one hand in the vaginal canal and another on the breast, Sister Patricia stated, "I can't see it, no—I don't think it would have been necessary to check the breasts with a hand in the pelvis."

Sister Patricia also testified that the entire pelvic examination should take thirty to forty-five seconds, although if there is some problem, it could take a maximum of four minutes. When asked if there was any reason for her hand to touch the clitoris, Sister Patricia stated,

A: Purposely we try to—I try to avoid that. And by our training in the United States, we are taught to always press downward for two reasons. One is if you are pressing upward, it hurts around the urinary opening. On a woman, the urinary opening is above the vagina. It causes pain but also it may stimulate the clitoris and you're not going to be able to do the exam, your exam. Most of your pressure goes downward and to the back. So usually, I would say stay away from that area.

Q: Now, during the process of this pelvic exam, the actual checking of the vaginal canal, is there any reason that you would have to move your two fingers in and out more than once?

A: No reason that I can think of except as when I was explaining to you, I always do the exam in the same order. But when I was explaining to you, I talked about measuring the pelvic bones first and then taking my fingers out and then I say, oh, but I have to see how big the uterus is.

So if someone forgot to check something, they may realize and have to reintroduce their fingers. But in actuality, I have done this for so many years, I always do it the same, check for the size of the uterus first, the size of the pelvic bones, and then you're out.

On cross-examination, Sister Patricia testified that, when she examines the vaginal walls, she finds no cause to repeatedly probe the vagina. Instead, she can "check on one side and then swing [her] wrist around and check on the other side." She stated, however, that it is possible another midwife might take their fingers out before checking another side of the vaginal wall. She also explained that it was possible to re-examine the breasts during a pelvic examination to evaluate the pregnancy and that she would have to go around to the side of the table since she could not reach from between the legs of the patient. Sister Patricia also testified that some people are able to detect infection by smelling the glove after the examination. Finally, Sister Patricia asserted that it should take between fifteen to twenty minutes to perform the entire examination.

The State further offered the testimony of Maria Isabel Rios Garza (herein "Rios"). Appellant's objection to the admission of her testimony was overruled. Rios testified that she made an appointment for January 30, 1992, at McAllen Maternity Clinic after she found out that she was pregnant. Rios remembered Garcia sitting in the waiting room. Suarez conducted Rios' examination immediately prior to Garcia's.

Once inside the examination room, Rios undressed and laid down on the examination table where Suarez first performed a breast examination and then performed a pelvic examination. Suarez asked her if she was still sexually active, and she responded, "yes." Suarez stood at the side of the examination table with two fingers inside her vagina while his other hand palpitated her breast. Rios testified she felt uncomfortable and became scared because appellant should not have touched her breasts having already done that examination. He then asked her to tighten her vagina. After removing his fingers from her vagina, he brought his hand to his nose, and without saying anything, smelled his hand and then took off the glove to throw it away. Rios testified that she had felt scared, that the entire exam took about twenty to thirty minutes, and that his hand was inside her vagina for ten to fifteen minutes. She stated that she was frightened by "what he had done" and that she did not file charges against Suarez because her husband would not let her. She then read from a statement she made on February 12, 1992.

On cross-examination, Rios testified that Garcia had called her on the telephone two days after their appointments at the clinic. During that telephone conversation Rios said that nothing unusual had happened during her visit to the clinic. Rios also agreed that she had not told Garcia that there was any breast fondling during her examination. Rios told Garcia that Suarez had done "something with the glove" that had not occurred during a prior pelvic exam. Rios also testified that Suarez, after smelling his gloved hand, told her that she had nothing wrong with her and that she did not have any infection. She then explained that Suarez used the Doppler monitor to find the baby's heartbeat before the pelvic examination.

Rios further testified that she arrived at the clinic between 4:15 and 4:30 p.m., that she waited another thirty to forty-five minutes before Suarez arrived sometime after 5:00 p.m., and that her examination lasted twenty to thirty minutes. Lastly, Rios testified that she returned to the clinic to have some Medicaid documents signed and that although she had a second scheduled appointment four weeks later, she did not return.

■ By point of error one, appellant contends that the evidence is insufficient to prove that Garcia did not consent to the penetration of her female sexual organ by

Suarez and that Garcia was physically unable to resist.

In determining the merits of an insufficiency claim, we review the evidence in the light most favorable to the verdict to determine if any rational trier of fact could have found each element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154, 157 (Tex.Crim.App.1991); *Prophet v. State*, 815 S.W.2d 836, 837 (Tex. App.—Corpus Christi 1991, no pet.). We also apply this standard to cases involving circumstantial evidence. *Earhart v. State*, 823 S.W.2d 607, 616 (Tex.Crim.App.1991); *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex. Crim.App.1983) (opinion on reh'g). We measure the sufficiency of the evidence against the indictment as incorporated into the jury charge. *Jones v. State*, 815 S.W.2d 667, 670–71 (Tex.Crim.App.1991).

In this case, the jury was asked to determine whether appellant intentionally or knowingly caused the penetration of Garcia's sexual organ without her consent. Specifically, the jury was instructed that sexual assault occurs when the other person does not consent and the defendant knows that the other person is physically unable to resist.

Appellant contends that the State failed to meet its burden of proof because Garcia consented to the pelvic examination. Appellant argues that consent was established by Garcia's testimony that she had been given pelvic examinations on previous prenatal physical examinations and that she knew a pelvic examination was "more than likely" to occur during her visit with Suarez. Appellant insists that Garcia consented to his actions because she allowed him to penetrate her vaginal canal with his fingers and because Garcia never communicated any withdrawal of consent or feeling of discomfort. Appellant argues, therefore, that there is insufficient evidence that Suarez knew Garcia had not consented to the examination, that she had revoked her consent, or that she felt something was improper about the manner in which Suarez conducted the examination. Appellant contends that it was irrational for the jury to conclude that Suarez knowingly placed his fingers in Garcia's sexual organ without her consent.

While Garcia may have consented to penetration of her female sex organ for purposes of the examination, the State argues that appellant exceeded the scope of Garcia's consent by engaging in acts of a sexual nature. The State contends that Garcia's testimony concerning appellant's questions and comments during the examination, the repeated up and down movement of his fingers while performing the examination, and his repeated touching of the clitoris provide sufficient evidence of appellant's actions exceeding the scope of Garcia's consent.

It is undisputed that Garcia consented to the penetration of her vagina as part of a prenatal pelvic examination. Yet, the State proceeded on the theory that Suarez exceeded the scope of Garcia's consent. Garcia consented to a proper, medical examination, and the State's witnesses testified to the accepted nature of such a proper examination. Much of appellant's conduct fell outside that standard. By acting beyond what Sister Patricia explained was a medically necessary examination, appellant exceeded Garcia's consent. Garcia, moreover, testified that she did not consent to appellant's repeated touching of her clitoris nor the prolonged penetration of her vagina with repeated up and down motions. Furthermore, appellant's examination of Garcia involved a special association. The relationship between appellant and Garcia was one of trust and confidence. *See, e.g., Jones v. Cross*, 773 S.W.2d 41, 43 (Tex.App.—Houston [1st Dist.] 1989, writ denied) (doctor-patient relationship is one of trust and confidence); *Fitzpatrick v. Marlowe*, 553 S.W.2d 190, 194 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.); *Allison v. Blewett*, 348 S.W.2d 182, 184 (Tex. Civ.App.—Austin 1961, writ ref'd n.r.e.). Appellant violated that trust. Any patient in Garcia's position is vulnerable to appellant's power and control over the situation. Because of this relationship, Garcia was apprehensive in questioning appellant's actions, and understandably fearful of calling out during the examination. Appellant, a licensed midwife in a role of authority, is responsible

for the administration of a medically proper examination. Garcia, a layperson relying upon the trust relationship, consented only to such a proper medical examination. After viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found lack of consent.

■ Appellant next claims that the evidence was insufficient to show that Suarez knew that Garcia was physically unable to resist. Here, the evidence must show that Suarez knew that Garcia's physical impairment was such that resistance was not reasonably calculated to be expected. *Elliott v. State*, 858 S.W.2d 478, 485 (Tex.Crim.App. 1993).

Appellant argues that his conviction under § 22.011(b)(3) must be reversed because there is no showing that the victim was *actually* physically unable to resist. Tex.Penal Code Ann. § 22.011(b)(3) (Vernon Supp. 1994). Appellant asserts that Garcia was conscious and aware of the examination, physically able to move her arms, and said nothing about any feelings of discomfort from the manner of the examination. Appellant relies on *McKinney v. State* for this position. *McKinney v. State*, 825 S.W.2d 238, 240 (Tex.App.—Fort Worth 1992, pet. ref'd). *McKinney* held that a conviction for sexual assault of a person who is physically unable to resist cannot be sustained when the victim was physically able to speak and move her arms and body.

The State, on the other hand, points to Garcia's testimony concerning her examination. Garcia testified that she was scared appellant would injure her baby while touching her clitoris, that she had not been able to cry out, that she had gone into a daze and just "froze," that her arms were not tied down but were at times pinned, and that she could not have gotten up even if she had wanted to because appellant never pulled out his hand from her vagina. Together with the testimony of witnesses Dora Munoz and Sister Deblieck establishing that it is very difficult, if not impossible, to get up from the examination table without assistance, the State maintains that the evidence was sufficient to prove Garcia was physically unable to resist.

■ The Texas Court of Criminal Appeals has retreated from *McKinney's* strict construction of the meaning of "physically unable to resist" under the sexual assault statute. In *Elliott*, the Court discussed the evolution of the concept of resistance in forcible rape law and extended a redefined concept to the law of sexual assault. The Court examined the standard of consent where an actor compels a victim to submit. The *Elliott* court concluded that a degree of resistance against a defining degree of compulsion is no longer necessary to constitute sexual assault under the recodified statute. *Elliott*, 858 S.W.2d at 485. That is, "if the actor's use of physical force or violence compels the victim to submit, the 'without consent' standard is satisfied." *Id.* In addition, there is no requirement under § 22.011(b)(3) that the actor "compels" the other person by threat or use of force or violence as there is under §§ 22.011(b)(1) and (b)(2). Furthermore, under the statute used in this case, § 22.001(b)(3), victims are not required to resist in order to obtain conviction. *See Jimenez v. State*, 727 S.W.2d 789, 792 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd). To show that the victim is physically unable to resist, the State need only prove that the actor knows that the victim's physical impairment is such that resistance is not reasonably to be expected. *Elliott*, 858 S.W.2d at 485. "Particularly in view of [the] legislative development, we are not inclined to be strict in construing the meaning of 'physically unable to resist' in § 22.011(b)(3)." *Id.*

The record reflects that Garcia was pregnant, that she was lying on an examination table with her legs in stirrups, that it was "difficult if not impossible" to sit up from her position, that the examination table was against the wall, and that Suarez was standing over her on the other side of the table. Garcia testified that she could not move knowing that Suarez still had his fingers in her vagina and that she "just froze" because of concern that her unborn baby might be injured. Furthermore, Garcia testified that her arms were not tied down but were at times pinned, and that she could not have gotten up even if she had wanted to because appellant never pulled out his hand from her

vagina. We find that a rational jury could conclude from this evidence that Suarez knew Garcia's physical impairment was such that resistance was not reasonably to be expected. We overrule appellant's first point of error.

By his second and third points of error, appellant contends that the trial court erred by admitting in evidence extraneous offense testimony by witness Rios. Specifically, appellant claims that the testimony was irrelevant and unfairly prejudicial. Appellant also argues that the trial court erred by failing to conduct a balancing test to determine the probative value and the prejudicial effect of Rios' testimony.

While appellant complains that the trial court failed to conduct a balancing test when admitting the extraneous offense testimony, there is no evidence in the record to indicate that the trial court did not do so. In fact, when appellant objected to Rios' testimony based on irrelevance and prejudice, the trial court specifically indicated that it would consider the probative value of the evidence versus its prejudice. We, therefore, find that the trial court conducted the balancing test when considering the admissibility issue as a whole. *See George v. State*, 841 S.W.2d 544, 548 (Tex.App.—Houston [1st Dist.] 1992, pet. granted).

We now turn to appellant's contention that the extraneous offense testimony was irrelevant and unfairly prejudicial. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX.R.CRIM. EVID. 401. This does not mean that the fact must be in dispute; rather, the fact must only have something to do with the ultimate determination of guilt or innocence in the case. *Mayes v. State*, 816 S.W.2d 79, 84 (Tex.Crim.App.1991). All irrelevant evidence is inadmissible. TEX.R.CRIM.EVID. 402. We review the trial court's admission of evidence over a timely lack of relevancy objection under an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1990) (opinion on reh'g); *Castillo v. State*, 865 S.W.2d 89, 95 (Tex.App.—

Corpus Christi 1993, no pet.). When the appellate court can say with confidence that by no reasonable perception of common experience can it be concluded that proffered evidence has a tendency to make the existence of a fact of consequence more or less probable than it would otherwise be, then it can determine that the trial court abused its discretion by admitting the evidence. *Montgomery*, 810 S.W.2d at 391. If the appellate court determines the trial court erred in admitting the evidence, it then proceeds to determine harmfulness. *Id.*; TEX.R.APP.P. 81(b)(2).

To be admissible, evidence must have relevance apart from its tendency to prove the character of a person in order to show that he acted in conformity therewith. TEX.R.CRIM.EVID. 404(b); *Montgomery*, 810 S.W.2d at 394. Whether evidence of other crimes, wrongs, or acts has relevance apart from character conformity is a question for the trial court. *Montgomery*, 810 S.W.2d at 391. It is the general rule that an accused may not be tried for some collateral crime or for being a criminal generally. TEX.R.CRIM. EVID. 404(b); *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App.1983). In certain circumstances, however, extraneous offenses are allowed if they fall within a recognized exception. Intent is one such exception. TEX.R.CRIM.EVID. 404(b). Evidence of extraneous acts is admissible to prove scienter, where intent or guilty knowledge is an essential element of the State's case and cannot be inferred from the act itself. *Garcia v. State*, 827 S.W.2d 27, 30 (Tex.App.—Corpus Christi 1992, no pet.); *Valenciano v. State*, 705 S.W.2d 339, 342 (Tex.App.—San Antonio 1986, pet. ref'd), *cert. denied*, 484 U.S. 861, 108 S.Ct. 177, 98 L.Ed.2d 130 (1987) (citing *Morgan v. State*, 692 S.W.2d 877, 880 (Tex. Crim.App.1985)). In determining the admissibility of extraneous offense evidence on appeal, we review not only the relevance of that evidence, but the State's need for it as well. *Montgomery*, 810 S.W.2d at 392; *Garcia*, 827 S.W.2d at 30.

A trial court's decision to admit relevant evidence over a timely objection of unfair prejudice is also reviewed under an

abuse of discretion standard. *Montgomery,* 810 S.W.2d at 391. Relevant evidence is admissible unless the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. TEX.R.CRIM. EVID. 403. The opponent of the evidence, in view of the presumption of admissibility of relevant evidence, must object to the evidence on the ground that the evidence's probative value is substantially outweighed by the danger of unfair prejudice. *Montgomery,* 810 S.W.2d at 389.

■ In this case, appellant contends that the trial court erred by allowing the testimony of Maria Isabel Rios. The State offered the extraneous offense evidence as probative on the issue of intent. Appellant objected to the evidence on the grounds of relevancy and prejudice. The trial court overruled the objections and admitted the testimony.

With the indictment and jury charge here, the State had the burden to prove beyond a reasonable doubt that appellant intended to penetrate Garcia without her consent and that appellant knew that because of Garcia's position, resistance was not reasonably to be expected. Garcia testified that she knew "more than likely," that with a prenatal visit to the midwife she would have a pelvic examination. The appellant in this case performed such an examination; however, the issue of whether Garcia consented to the manner in which the examination was performed was contested. Testimony was also elicited that pelvic examinations may require penetration of the female sexual organ. Thus, by simply considering Garcia's testimony and appellant's act itself, appellant's intent or guilty knowledge cannot be readily inferred.

The extraneous act in this case was offered as evidence of appellant's intent to go beyond accepted, routine practice when conducting a pelvic examination, and to show whether appellant knew that Garcia would be unable to resist. Rios testified that appellant held two fingers in her vagina while also palpitating her breast. And, after asking her to tighten her vagina, he removed his fingers and smelled his hand. Rios also testified that appellant's hand was inside her for ten to fifteen minutes and that the exam took twen-ty to thirty minutes. Rios testified that she became scared because she felt appellant should not have conducted the exam in this manner. Like Garcia, Rios did not resist appellant's actions. Rios' testimony established more than character conformity. The allowed evidence demonstrated appellant's intent to go beyond what a prenatal patient consents to in a pelvic examination, and indicated that appellant knew Garcia would be unable to resist. *Cf. Keller v. State,* 818 S.W.2d 425, 429 (Tex.App.—Houston [1st Dist.] 1991, pet. ref'd) (extraneous transactions that defendant failed to pay others was admissible to show that defendant intended not to pay victim). Therefore, the evidence was relevant under rule 401 and admissible under rule 404(b) to show intent. TEX. R.CRIM.EVID. 401, 404(b).

■ Once the proponent shows that evidence is material, it is admissible unless the opponent demonstrates that the negative attributes of the evidence substantially outweigh any probative value. *Montgomery* 810 S.W.2d at 377; TEX.R.CRIM.EVID. 403. Several factors may be used to determine whether the probative value of an extraneous transaction outweighs the prejudicial effect. These include, similarity between the extraneous transaction and the charged offense, the closeness in time of the acts, and the availability of other sources of proof. *Keller,* 818 S.W.2d at 429–30. Here the extraneous transaction was significantly similar to the charged offense in nature, and occurred immediately prior to the charged offense. Furthermore, the only source for evidence of intent and appellant's knowledge must come through the testimony of other patients. As outlined in *Montgomery,*

> The appellate court should not conduct a *de novo* review of the record with a view to making a wholly independent judgment whether the probative value of evidence of "other crimes, wrongs, or acts" is substantially outweighed by the dangers of unfair prejudice. It should reverse the judgment of the trial court "rarely and only after a clear abuse of discretion." This appellate deference is a rule of judicial restraint, intended, once again, to avoid the anomaly

of having appellate courts usurp a function that the system assigns to the trial court. *Montgomery,* 810 S.W.2d at 395. "In short, the appellate court should afford the trial judge a 'limited right to be wrong,' so long as the result is not reached in an 'arbitrary or capricious manner.'" *Keller,* 818 S.W.2d at 430 (citing *Montgomery* 810 S.W.2d at 395). We cannot say that the trial court abused its discretion in this case. We find that the trial court's ruling to allow Rios' extraneous offense testimony was within the zone of reasonable disagreement; therefore, the trial court did not abuse its discretion. We overrule appellant's second and third points of error.

Accordingly, the trial court's judgment is AFFIRMED.

DORSEY and FEDERICO G. HINOJOSA, Jr., JJ., dissenting.

DORSEY, Justice dissenting.

I do not think the jury, under the indictment and instructions of the law it was given, could have found Appellant guilty with the evidence it was presented. Accordingly, I dissent and would reverse and order an acquittal.

The charge was that appellant intentionally penetrated the vagina of the victim without her consent. There is no dispute that he intentionally penetrated her vagina; similarly there is no question that she consented to a pelvic examination and the penetration of a patient's vagina is how such an examination is done. All agree that the complainant consented to appellant's penetration of her vagina.

The evidence relied on to support the conviction are the actions of the appellant while conducting the examination; largely while his hand was inside the patient that he touched her unnecessarily while in her vagina and that the examination took longer than it should have. As repugnant and unprofessional as those activities are, I do not find they constitute evidence of the particular crime charged. In particular, the patient consented to appellant's penetration of her vagina.

The majority argues that although the patient consented to a vaginal examination, and thus consented to appellant's penetration of her, her consent was limited to that which was necessary for the examination. When he went beyond that which was necessary, he committed sexual assault because he exceeded that to which she consented. However, that is not the crime with which he was charged.

At the time he placed his hand in her, he had her consent to do so. There is no evidence that she withdrew her consent and the penetration continued.

Given this evidence and charged offense, I must hold the conviction is not supported by the evidence. I would reverse and order an acquittal.

FEDERICO G. HINOJOSA, Jr., Justice, dissenting.

I respectfully dissent. I disagree with the majority that no error occurred in admitting the extraneous offense testimony of Mary Isabel Rios.

The majority correctly states the standard of review in determining the admissibility of extraneous offense evidence, as enunciated in *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (opinion on reh'g), and *Garcia v. State,* 827 S.W.2d 27, 30 (Tex. App.—Corpus Christi 1992, no pet.). However, I believe that the majority incorrectly concludes that the trial court did not abuse its discretion by admitting the evidence because it is relevant to the issue of "intent."

Rios' testimony is summarized in the majority's opinion. During a hearing outside the presence of the jury on appellant's motion in limine, the State argued that because the extraneous offense showed identical and not merely similar acts committed by the defendant, the evidence was admissible to prove his intent to commit the offense, citing *Valenciano v. State,* 705 S.W.2d 339 (Tex. App.—San Antonio 1986, pet. ref'd), *cert. denied,* 484 U.S. 861, 108 S.Ct. 177, 98 L.Ed.2d 130 (1987). During its final argument, the State focused strongly on the extraneous conduct, imploring the jury to consider both

instances of conduct and to find appellant guilty of the offense charged.

The majority discusses the relevancy of the extraneous conduct and concludes that appellant's intent cannot readily be inferred from the evidence by simply considering Garcia's testimony and appellant's act. The majority determines that, since the allowed evidence demonstrated appellant's intent to go beyond what a prenatal patient consents to in a pelvic examination and indicated appellant's knowledge of Garcia's inability to resist, the evidence is relevant under TEX.R.CRIM.EVID. 401 and 404(b). The majority then determines that because 1) the extraneous conduct was significantly similar to the charged offense in nature, 2) it occurred immediately prior to the charged offense, and 3) the only source for evidence of intent and appellant's knowledge must come through the testimony of other patients, the probative value of Rios' testimony outweighs the prejudicial effect. Finding the trial court's ruling "within the zone of reasonable disagreement," the majority concludes that the trial court did not abuse its discretion by allowing the extraneous offense testimony. I disagree with the majority's evaluation of the evidence.

When we determine the admissibility of extraneous offense evidence on appeal, we review not only the relevance of that evidence, but the State's need for it as well. *Montgomery,* 810 S.W.2d at 392; *Garcia,* 827 S.W.2d at 30. Evidence of extraneous acts has been held admissible to prove intent where it is an essential element of the State's case and cannot be inferred from the act itself. *Garcia,* 827 S.W.2d at 30; *Valenciano,* 705 S.W.2d at 342 (citing *Morgan v. State,* 692 S.W.2d 877, 880 (Tex.Crim.App. 1985)).

Because appellant's intent to penetrate Garcia's sexual organ without her consent and knowing she was physically unable to resist can readily be inferred from Garcia's own testimony, there was no compelling need to admit the extraneous act witness' testimony to show intent. *Compare with Valenciano,* 705 S.W.2d at 342 (extraneous evidence necessary to prove intent, where defendant's conduct alone can be considered consistent with accident as with a specific lascivious

intent). Appellant's conduct in engaging in acts of a sexual nature during Garcia's physical examination can only be considered consistent with a specific lascivious intent to exceed the scope of her consent to a proper, medical examination. *See also Lazcano v. State,* 836 S.W.2d 654, 659–60 (Tex.App.—El Paso 1992, pet. ref'd).

According to the majority, Garcia's testimony, together with Sister Patricia's testimony concerning the accepted nature of a proper physical examination, suffices to establish appellant's guilt on the issue of consent. It seems inconsistent for the majority to later determine that evidence of the extraneous conduct is additionally necessary to establish the requisite companion element of intent. I would hold that the trial court abused its discretion in admitting the extraneous offense evidence to show intent.

Even if relevant, the negative attributes of the extraneous offense evidence substantially outweighed any probative value. TEX. R.CRIM.EVID. 403 assumes that a piece of evidence may be both relevant and prejudicial. *Castillo v. State,* 865 S.W.2d 89, 96 (Tex.App.—Corpus Christi 1993, no pet.) (en banc denial of motion for rehearing). Being relevant, the evidence is admissible, subject to the rules of evidence. TEX.R.CRIM.EVID. 402; *Castillo,* 865 S.W.2d at 96. Nevertheless, Rule 403 envisions occasionally excluding relevant evidence on the grounds that its probative value is too slight to justify the risk that a jury may emotionally respond to the evidence. *Castillo,* 865 S.W.2d at 96. "As the rules contemplate . . . extraneous offense evidence is inherently prejudicial." *Id.* at 97.

After a thorough review of the record, I conclude that the probative value of the extraneous offense evidence is marginal and outweighed by its prejudicial effect. During the State's examination of Rios and at final argument, the prosecution focused on the following two facts: 1) that Suarez palpitated Rios' breasts after having already performed a breast examination, and 2) that Suarez smelled the rubber glove he used to perform the pelvic examination before he threw it away. The record is clear that the prosecution wanted to show character conformity, rather than intent. There was no concen-

trated discussion of the material elements of consent or inability to resist. The extraneous offense evidence was not kept brief. Instead, much attention was paid to the extraneous offense conduct during the rest of the trial.

Persons are not tried as criminals generally; they are tried for individual offenses. *Castillo,* 865 S.W.2d at 97. From the presentation of the State's case, it appears appellant was tried for a collateral crime as well as this crime, and the State's intent to inflame the jury with the extraneous evidence is more than apparent. Under these facts, I would hold that the trial court erred by admitting the extraneous offense evidence. I cannot conclude beyond a reasonable doubt that the erroneous introduction of the extraneous offense did not contribute to the appellant's conviction. I cannot hold that the error was harmless beyond a reasonable doubt.

Accordingly, I would sustain appellant's second point of error. I would reverse the trial court's judgment and would remand the case for a new trial.

For the reasons stated above, I respectfully dissent.