

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00489-CR

ALLEN KEITH ANDERSON, SR.        APPELLANT
A/K/A ALLEN K. ANDERSON

V.

THE STATE OF TEXAS           STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

In a single point, Appellant Allen Keith Anderson, Sr. a/k/a Allen K. Anderson appeals his conviction for sexual assault.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II.  Background

The State charged Anderson with the sexual assault of Lori Miller (a pseudonym).  Anderson pleaded not guilty, but a jury found him guilty as charged in the indictment and assessed his punishment at six years' confinement.[2]  This appeal followed.

## III.  Sufficiency

Anderson concedes that under the applicable standard of review, the evidence in the record establishes that he had sexual intercourse with Miller.  However, he complains that the evidence did not prove beyond a reasonable doubt that she did not consent to the intercourse.

### A.  Standard of Review and Applicable Law

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Jackson*, 443 U.S. at 319, 99 S. Ct.

---

[2]Because Anderson challenges only the sufficiency of the evidence to support his conviction, we will discuss the facts below.

at 2789; *Isassi*, 330 S.W.3d at 638. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638.

As authorized by the indictment, the jury convicted Anderson of intentionally or knowingly causing the penetration of Miller's female sexual organ by inserting his penis or his finger into it while knowing that he did so without her consent and that she was either unconscious or physically unable to resist or that she did not consent and was unaware that the sexual assault was occurring. *See* Tex. Penal Code Ann. § 22.011(a)(1)(A), (b)(3), (5) (West 2011); *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). When assent in fact has not been given, and the actor knows that the victim's physical impairment is such that resistance is

3

not reasonably to be expected, sexual intercourse is "without consent" under the sexual assault statute. *Elliott v. State*, 858 S.W.2d 478, 485 (Tex. Crim. App.), *cert. denied*, 510 U.S. 997 (1993).

## B. Analysis

Anderson argues that the evidence is insufficient to show that he penetrated Miller without her consent because she was either unconscious or physically unable to resist or unaware that the sexual assault was occurring, stating that

> [t]he State had urine samples taken from Ms. Miller at the hospital but never presented any type of scientific evidence to prove whether Ms. Miller might have been unconscious and/or physically unable to resist due to ingestion of too much alcohol or any type of drugs. To the contrary, the evidence presented by the State actually proves that Lori Miller knew what was going on and told [Anderson] "no" and kicked at him. The probative facts of this case do not support a conviction for the offense alleged in the indictment.

The State replies that Anderson's entire argument is that "since there was (in his view) conflicting evidence regarding the victim's recollections of the attack, it follows that he is entitled to a reversal. This is simply not the state of the law in Texas" because a verdict is not subject to acquittal simply because the defense has presented a reasonable alternative hypothesis. *See Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) ("We have rejected the reasonable hypothesis construct as a measure of legal sufficiency.").

4

## 1. Evidence on Consent

Lori Miller, a school teacher working on her doctorate degree, testified that on December 11, 2009, she left her car at a Starbucks and rode with Sherri Stephens, an acquaintance she had known for almost a year, to a tour of Christmas lights in the Plano area. They arrived around 7:00 p.m. and boarded the tour bus with their beverages—Miller had brought a thermos of hot cocoa with two shots of bourbon in it, and Stephens had brought five beers. The tour stopped at a convenience store at one point, and Miller bought a four-pack of miniature wine bottles and drank one of the bottles instead of the cocoa because it was hot inside the bus. Stephens drank all five beers.

The tour ended around 11:00 p.m., and Miller was tired and wanted to go home, but Stephens was driving and wanted to go out, telling Miller that she just wanted to have one drink.[3] They ended up at Rob's Billiards, a bar Stephens said neither woman was familiar with. Stephens drank a bottle of beer and then ordered a pitcher of beer and invited two men—Anderson and Charles Williams—to their table; Miller and Stephens both testified that Miller drank only water at the bar. Miller said that she was not intoxicated or buzzed at all by this point. They stayed at the bar until last call, around 2:00 a.m.

---

[3]Contrary to Miller's testimony, Stephens testified that she did not recall Miller telling her that she was tired and wanted to go home. Instead, Stephens said that she thought they had both planned all along to hang out later.

5

At last call, the men invited Miller and Stephens back to their apartment, but both women refused. Miller testified that she said she was tired and wanted Stephens to take her back to her car so that she could go home and that Anderson said, "Oh, well, we'll go to your apartment." Miller refused, and someone brought up going to Stephens's house instead. Miller said that Stephens hesitated at first and then asked Miller to come because she did not want to be alone with the men.

Stephens testified that Miller just said that she wanted to get her car and follow them but that Stephens did not feel Miller was capable of driving because Miller "had had quite a bit to drink," even though Stephens acknowledged that Miller drank only water at the bar and that Miller's last alcoholic beverage had been around 11:30 p.m. Miller said that Stephens was between buzzed and drunk when they left Rob's Billiards.

The parties stopped for some more alcohol on the way to Stephens's house. Miller and Williams rode with Stephens to her house; Anderson followed in a separate car. Once inside the house, Miller sat on the couch while Stephens took out some Crown Royal and Pepsi and started mixing drinks. Miller drank some water, plugged her cell phone into Stephens's laptop, and then went back to the couch and started to fall asleep. Miller opened her eyes when Anderson shoved her and said, "You were supposed to come over and hang out with us. This isn't hanging out." Miller put her shoes on and joined everyone outside, but

6

because it was cold, she went back in, removed her shoes, covered herself with a blanket, and fell asleep on the couch.

Miller testified that the next thing she remembered was Anderson sitting down on the end of the couch and asking if he could lay down with her. She said no. Stephens and Williams kept going in and out of the house during this time, while Miller went back to sleep. Stephens said that at some point when she and Williams came back inside, Miller and Anderson were no longer in the living room. Miller said that the next thing she recalled was waking up in Stephens's guest room in a pool of her own blood.

Miller said that upon awakening, her first thoughts were, "Where am I and how did I get here, and it was just all unfamiliar. I couldn't remember. Finally it dawned on me that I'm at [Stephens's] house. That's when I noticed the wet feeling under me." Miller stated that all of her clothes were on the floor, next to a pile of men's clothing. Miller wrapped herself in a blanket and pulled the bloody sheets from the bed before scooping up her clothes.

The door of the nearby bathroom was locked, and she could hear the sound of a shower. Miller returned to the bedroom, stating,

> I shut the door, and eventually—I don't even know how long it was. I didn't want to sit back down on the bed because I had blood all over me, so I just stood there, and eventually the bedroom door opened and [Anderson] came in and he had a towel or a blanket wrapped around his waist and he was wet. So I just walked past him, and at that point, I became very scared of what might have happened. I went into the bathroom and I sat down on the toilet and blood was just pouring out of me. I felt very faint, very weak, very dizzy.

7

Miller showered, used some toilet paper to try to stop the bleeding, and put her clothes on. She took the bloody sheets to the kitchen and asked Stephens where her laundry room was; Stephens, who testified that she did not recall how many Crown and Pepsi cocktails she had consumed that night, was "pretty drunk at that point."

Stephens testified that she remembered Miller bringing out the sheets and saying that she thought she had started her period. She did not recall where Anderson was at any particular point in time.

Miller said that after she put the sheets in the washer, she went back to the guest room. Anderson came in, turned on the light, and asked what she was doing. She told him that she was tired and just wanted to sleep. He turned off the light, shut the door, then returned a few minutes later, turned the light on again, and opened a window. She heard some clattering. She asked him for water and for her cell phone; he brought her some water but said her cell phone was not there.

Miller said that she was extremely thirsty, stating, "[A]s I kept drinking the water, I kept feeling worse, and that's when I started suspecting that I had been drugged at some point. That's why I couldn't remember how I got to the guest room." She denied that she had in any way implied by her actions or words to Anderson that she wanted to have sexual intercourse with him, stating, "In fact, it was the opposite. I was completely disinterested. All I wanted to do was sleep."

At some point, Stephens told Anderson and Williams to leave. When Miller asked Stephens to call 911, Stephens realized that her phone was missing. Stephens borrowed a neighbor's phone and called 911. Stephens answered the door when the police arrived, and Miller said that she heard Stephens tell the officer, "I think my friend was drugged." The officer called victim's assistance to take Miller to the hospital. It was around 11:00 a.m. when Miller arrived at the hospital.

Miller underwent a sexual assault examination and then was transferred to the OB/GYN trauma unit to repair the lacerations in her cervical wall. Miller stated,

> [S]omewhere between talking to Sarah [the victim's assistance counselor] and the SANE[4] nurse, I had flashes of me kicking him, of me being in that bedroom, in that bed, and me kicking him and saying "Stop," and then him being by my head and saying, "I'm going to make you pay."

Arlington Police Officer Tracey Beseda testified that she was dispatched to Stephens's house around 7:27 a.m. on a report of theft. Stephens answered the door, reeking of alcohol and appearing intoxicated. Miller made herself known to the officer by calling out from the guest room. Officer Beseda called for assistance and for a crime scene investigator, briefed the officers who arrived, and then followed the victim assistance van to the hospital.

---

[4]SANE is an acronym for sexual assault nurse examiner.

Heather Gerarde, the sexual assault nurse examiner, testified that she performed the sexual assault exam on Miller. She testified as follows with regard to what Miller told her during the exam:

> She was at a bar, went over to her friend's house, fell asleep on the couch, awoke in her friend's room with a man on top of her. She remembers pushing him off with her legs. She remembers drinking water that night. She remembers his face rubbing up against her face, she remembers yelling "no" multiple times. She remembers waking up in the bed in a pool of wet substance, getting up and blood running down the insides of her legs, realizing that the pool that she was laying in was blood. She remembers him being in the shower. She put her clothes back on and ended up getting into a fetal position in the corner, was still bleeding, was complaining of abdominal pain, and he was telling her to get back up. She said it— it stung when she urinated, and that she had pressure in her lower abdomen.

Gerarde stated that Miller did not remember everything that occurred during the sexual assault but did recall trying to push him or kick him off of her and saying "no," that his penis and his finger went in her vagina, and that Anderson said to her in a whisper that he was going to make her pay, "but the rest of the accounts were unknown because she had loss of consciousness."

Gerarde said that Miller told her the assault occurred between 3:28 a.m. and 5:00 a.m. because the last time she had looked at her phone was 3:28 a.m., when she was on the couch in the living room. Gerarde testified that on the inside of Miller's vagina, "she had multiple blood clots and some tissue that we had to remove with forceps," that it was abnormal to see blood clots there,

10

particularly since Miller was not menstruating, and that of all the exams Gerarde had done, "this is the worst vaginal injury that [she had] seen."[5]

Dr. Catherine Olsen, the surgeon who sutured the second-degree laceration to Miller's fornix—the space between the cervix and rectum—testified that Miller would not have healed without surgery. Dr. Olsen said that the injury was caused by penetration, that a penis could not have caused the injury, and that a fingernail could have because it would have had to have been caused by something with an edge. Dr. Olsen also noted that there were multiple abrasions on Miller's female sexual organ.

Dr. Olsen then gave the following testimony:

Q. So that was not a superficial cut in any way, shape[,] or form?

A. No.

Q. Would you agree with me, Dr. Olsen, that the more relaxed a woman is and the more relaxed her vagina is, the easier it is for penetration for a penis, a finger[,] for any kind of object?

A. Yes.

Q. Maybe the trust issues go along in with that, but also physically relaxed as well. And the most relaxed that a person could be is probably if they are unconscious due to intoxication, sleep[,] or any other method of being unconscious or unaware?

A. Yes.

---

[5]Gerarde obtained a urine sample from Miller after 2:00 p.m. that afternoon and finished the exam at 4:20 p.m. No one testified about the results of any testing on the urine sample.

11

Q. So someone laying down sleeping or laying down in bed should be able to withstand penile penetration or digital penetration and not have sustained wounds like that?

A. Correct.

Q. And, in fact, if you see somebody who has a wound like that and has been—and they tell you that they had been laying down when that occurred, what does that suggest to you? I mean, how much force was needed to create something like that?

A. I think that had to have been a forceful entry or a forceful— there had to have been a certain amount of force to go into that. And for that kind of injury, to not be in excruciating pain, the person would have to be asleep in some way or not conscious in some way, because that's—that's a pretty extensive wound.

Q. Might that, a wound like that, wake them up or bring them out of unconsciousness?

A. If that happened while somebody was asleep, they would definitely wake up.

Stephens reported a number of items missing from her house, including Playstation games, the women's cell phones, and her laptop. Police found air fresheners, soap, and a Playstation game in the bushes outside the house. A partial palm print lifted at the scene was matched to Anderson.

Arlington Police Detective Becky Szatkowski testified that she interviewed Anderson twice during the case. She did not tell him about the investigation for sexual assault before she started the first interview. Anderson told her that he was at Rob's Billiards before Christmas in 2009 with a friend, that they met two "white chicks" in their thirties there, and that they went to the house of one of the women, where he had sex with one of them. He did not remember Miller's name.

12

Anderson told the detective that Miller had been "just sipping" beer but not drinking a lot at the bar and that she did not drink anything at the house. He also told the detective that he had touched Miller in her vaginal area or on her clitoris with his fingers while she was in the living room and that the touching was consensual. He stated that he had penile-vaginal sex with Miller, that he wore a condom, and that he stopped when she started her period. Detective Szatkowski then gave the following testimony:

> Q. And did he describe to you in detail about that—the sex that he had with the victim?
>
> A. He did. He said that he was on top of her, and that they were kissing on each other, he was kissing her face and neck and chest, and that it was a consensual act.
>
> Q. Did he describe how long it lasted?
>
> A. Five to six minutes.
>
> Q. And did he tell you why it stopped?
>
> A. Yes, he did. He said that he pulled out to check himself, and that there was blood on the condom.
>
> Q. Did you find that strange for him to say that he pulled out to check himself?
>
> A. Yes.
>
> Q. Why did you think that was strange?
>
> A. It was odd to me that during a sexual encounter he's going to just stop to—to look at—I mean, he's described it as looking at himself, and that he's going to stop that encounter prior to having any kind of climax to look at himself.
>
> Q. Did he say whether he turned on the light to check his condom?

13

A. Yes. He said he turned on the light.

Q. What did he say he saw when he turned on the light?

A. He saw blood on his condom.

Q. And how did he feel about that?

A. He was very upset about it.

Q. Did he tell you why he was upset?

A. Because he did not appreciate that she didn't tell him that she was on her period. He said that the time he looked that she was telling him that she was on her period and he thought it was, in his words, nasty that she would bleed or be on her period and he would be exposed to her blood.

. . . .

Q. Did he later tell you anything about the amount of blood?

A. He said it was a lot of blood, and he said he can't ever remember seeing that much blood from somebody's period.

. . . .

Q. Did you ever ask him, was she wearing a sanitary pad or tampon?

A. Yes. I asked if he saw a sanitary pad, and he said no. I asked if when he touched her clitoris, if there was blood on his fingers or if there was any other time that, you know, he saw the blood, and he said no.

. . . .

Q. Did he ever say anything about not lying to you?

A. Yes. At the end of the—at the end of that interview, he basically told me if he thought he was going to be in trouble for something, and this is not an exact quote, but if he thought he was going to be in trouble for something, then he would lie about it to get out of trouble.

14

When Detective Szatkowski told Anderson that Miller had been injured, he did not show surprise or ask what her injuries were. During this interview, he denied knowing anything about Miller's cell phone or taking anything from Stephens's house. Anderson denied that he had committed sexual assault, said that his sexual encounter with Miller was consensual and that they walked into the guest room, and said that he flushed the condom.

Miller gave Detective Szatkowski the serial number of her cell phone, and after Anderson's first police interview, the detective obtained a warrant to search Anderson's apartment. Detective Szatkowski found Miller's cell phone in Anderson's apartment.

Detective Szatkowski met with Anderson again the day after the search warrant issued. When asked about Miller's cell phone, Anderson initially claimed that it was his cell phone and that he had bought it for $40 on the night they met at Rob's Billiards before they went to Stephens's house. However, he later admitted taking the cell phone and Stephens's laptop, which he "sold . . . to a guy named A.J. for $350." He also admitted taking some bath soap "because it smelled good" and that he was able to take these items by putting them out a window.

2. Analysis

Although there was some evidence in the record that at some point during one of their encounters that evening, Miller might have been conscious enough to kick Anderson off of her and tell him "no," from the rest of the evidence, the

15

jury could have concluded that Anderson penetrated Miller with his penis or with his finger without her consent and while she was either unconscious or physically unable to resist or unaware that the sexual assault was occurring.

Miller testified that she was on the couch in the living room when Anderson asked if he could lay down with her, that she said no, that she went to sleep, and that the next thing she immediately recalled was waking up in a pool of her own blood in the guest room, while Detective Szatkowski testified that Anderson told her that he touched Miller's female sexual organ with his finger with Miller's consent while Miller was on the couch in the living room. Therefore, the jury could have concluded from the evidence that Anderson digitally penetrated Miller without her consent.

Further, Anderson admitted to Detective Szatkowski that he penetrated Miller with his penis, and the jury was entitled to infer that Miller was unconscious during the initial penetration. Gerarde testified that during Miller's SANE exam, Miller recalled falling asleep on the couch and waking up in Stephens's room "with a man on top of her," that his penis and his finger went into her female sexual organ, and that she tried to push him off of her with her legs, resulting in Anderson's threat to make her pay. Miller testified that at some point prior to her sexual assault exam with Gerarde, she had flashbacks of being in the bed in the guest room, kicking Anderson, saying "Stop," and hearing him say that he would make her pay, but she did not testify about what point during this encounter she awoke from her nap on the couch to find herself in bed with Anderson.

16

And the jury could have concluded that Anderson penetrated Miller's female sexual organ with something—possibly his finger—and lacerated her fornix which, according to Dr. Olsen, Miller would have to have been either asleep or unconscious to endure, even though Dr. Olsen also testified that someone laying down or sleeping should have been able to withstand digital or penile penetration without sustaining such a wound.

While Detective Szatkowski said that Anderson claimed that his digital and penile penetration of Miller was consensual, Miller testified that it was not. The jury was entitled to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638. Viewed in the light most favorable to the verdict, we conclude that the jury could have found beyond a reasonable doubt that Miller did not consent to any of Anderson's penetrations, and we overrule his sole point. *See Elliott*, 858 S.W.2d at 485; *see also Lewis v. State*, No. 13-10-00655-CR, 2012 WL 29326, at *3–4 (Tex. App.—Corpus Christi Jan. 5, 2012, no pet. h.) (mem. op., not designated for publication) (stating that complainant's testimony about defendant being on top of her when she awoke supported a finding that he began the sexual assault while she slept, without her consent); *Mauldin v. State*, No. 05-09-00513-CR, 2010 WL 936695, at *4 (Tex. App.—Dallas Mar. 17, 2010, pet. ref'd) (not designated for publication) (stating that the jury was entitled to conclude that complainant did not consent when she testified that she did not consent to any sexual act with appellant, that she blacked out several times

17

during the evening because of the amount of alcohol she had consumed—which was consistent with her elevated blood alcohol level hours later—and that she awoke at one point to find appellant on top of her with his penis inside of her, despite appellant's conflicting testimony that she consented, never appeared to be intoxicated, and never passed out that night); *Hughes v. State*, 194 S.W.3d 649, 654 (Tex. App.—Tyler 2006, no pet.) (stating that the evidence was sufficient to show lack of consent when, among other things, appellant commenced sexual abuse while the complainant slept); *Taulung v. State*, 979 S.W.2d 854, 855, 857–58 (Tex. App.—Waco 1998, no pet.) (finding evidence sufficient to support sexual assault conviction when, among other things, complainant testified that she awoke to find defendant on top of her, engaging in sexual intercourse with her, before she pushed him away and yelled that defendant had raped her).

## IV. Conclusion

Having overruled Anderson's sole point, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, DAUPHINOT, and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 12, 2012

18